GLEN G. NEPSTAD v. J. M. LAMBERT, INDIVIDUALLY AND
d. b. a. TRUCK CRANE SERVICE COMPANY, AND OTHERS.
NORTHERN STATES POWER COMPANY, RESPONDENT.[1]

August 3, 1951.

No. 35,341.

[1]Reported in 50 N. W. (2d) 614.

2

*Meagher, Geer & Markham, Howard P. Quealy,* and *Herbert C. Davis,* for appellants.

*Thompson, Hessian, Fletcher & McKasy,* for respondent Glen G. Nepstad.

*Charles H. Weyl,* for respondent Northern States Power Company.

CHRISTIANSON, JUSTICE.

This case involves an action in tort to recover damages for injuries sustained by plaintiff in an accident occurring at Menomonie, Wisconsin, on August 6, 1946.

It will perhaps make the preliminary facts more meaningful if it is stated at the outset that plaintiff was injured when some portion of a truck crane made contact with a high-voltage (66,000) power line operated by defendant Northern States Power Company. The crane was being used on a construction job, and at the time it contacted the power line plaintiff was holding some steel trusses fastened to the boom of the crane by means of a steel-hoisting cable. As a result of the contact, the current was transmitted through the crane and trusses to plaintiff, who sustained burns so severe that he lost the use of one hand, lost one leg by amputation, and underwent numerous operations.

Suit was brought in Hennepin county district court against (1) J. M. Lambert, the owner of the crane, doing business as the Truck Crane Service Company; (2) August Pasma, the operator of the crane; and (3) Northern States Power Company. Subsequent to the accident, all assets and liabilities of Lambert's business were assumed by Truck Crane Service Company, a Minnesota corporation, and it has also been designated as a defendant. With the exception of the Northern States Power Company, which is a Wisconsin corporation, all parties to the suit are residents of Minnesota.

At the trial, special interrogatories were submitted to the jury in order to settle issues of fact as required by the comparative negli-

gence law of the state of Wisconsin.[2] The jury found: (1) That plaintiff sustained total damages of $77,500; (2) that Pasma, at the time and place of the accident, was not a loaned servant; (3) that Pasma was guilty of 65 percent negligence; (4) that Northern States was guilty of ten percent negligence; and (5) that plaintiff was guilty of 25 percent contributory negligence.

All the defendants except Northern States joined in an alternative motion for judgment notwithstanding the verdict or a new trial. This appeal is from the order denying their motion. Defendant Northern States was made a respondent on appeal, and on December 29, 1950, it moved this court to dismiss the appeal as to it. Plaintiff did not oppose this motion, but appellants did. The record on appeal contains the testimony of only one of Northern States' witnesses, and none of the assignments of error have any bearing on the issue of negligence on its part. The motion to dismiss was denied with leave to renew it at the time of the hearing on the merits; and, having been renewed, is now before us as one of the matters to be decided on this appeal.

In this case, we have had the benefit of a clear and detailed statement of the facts and an excellent plat showing the premises upon which the accident occurred. Through the medium of a miniature model, we have been shown a truck crane of the type involved in the accident. The particular truck crane involved weighs 24 tons and is a machine of substantial value.

A truck crane, as its name implies, is a crane mounted upon the chassis of a truck and is frequently used on construction projects

[2]The Wisconsin comparative negligence statute (Wisconsin Stat. § 331.045) provides as follows:

"Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not as great as the negligence of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of negligence attributable to the person recovering."

For an interesting analysis of the statute and review of cases decided under it, see Campbell, *Ten Years of Comparative Negligence,* 1941 Wis. L. Rev. 289.

for lifting heavy weights. The crane portion of the machine is motor-operated and is controlled by the crane operator, who is seated in a cab mounted upon the rear of the truck chassis approximately five feet above the ground. A turret arrangement enables the operator to swing both the cab and the boom, which was 60 feet long, in a complete circle. A system of cables and pulleys operated from the cab regulates the elevation of the boom and the hoisting of the loads. Five levers and two pedals are used in working the various cables, but on the particular job involved only three levers and one pedal were being used. Because the boom is offset and because the cab has a roof, the operator's view as he sits in the cab is limited to his right and upward, but is unobstructed straight forward and to the left. When the motor of the crane is in operation, its noise prevents the operator from hearing the voices of persons on the ground. The truck portion of the machine is entirely independent of the crane. It operates on a separate motor and is driven by another worker, known in the trade as an oiler, from a cab mounted in standard position on the front of the truck chassis.

Plaintiff's employer, the L. G. Arnold Company, was a general contractor in charge of a project to expand the Lakeside Aluminum Company's plant at Menomonie, Wisconsin. It had from 22 to 25 men employed on the project in addition to a steel crew of four men. Friday, August 2, 1946, a few weeks after construction had been started, the Arnold company, through its agent, phoned Lambert, who rents cranes as a business, to inquire whether he had a crane with operators available to go to Menomonie the following Monday morning to help with the erection of steel. It was agreed that the Arnold company would pay $12 per hour, that the crane would arrive on the work site by noon on Monday, and that the crane would be equipped with a 60-foot boom. In addition to this conversation, the only other evidence bearing upon the contract terms was an invoice indicating that the use of the machine and the gas, oil, maintenance, and services of the operator and oiler were included in the rental charge of $12 per hour.

6

After receiving the call, Lambert told his dispatcher to send a crane with two operators to the aluminum company's plant. When Pasma reported in to the dispatcher, saying that he and Ben Pastwa, an oiler, would finish the job they were on in St. Paul that evening, he was told to leave Monday morning for Menomonie, Wisconsin, and to report to the Arnold company at the aluminum company's plant. He was also told that a 60-foot boom would be needed. Both Pasma, the operator, and Pastwa, the oiler, were on Lambert's payroll. Lambert also had workmen's compensation coverage on them, made their withholding tax deductions, and paid their social security taxes. Both men were paid on an hourly wage basis.

Pasma and Pastwa reported to George Morris, the Arnold company's steel foreman, when they arrived at the work site about 10:30 Monday morning. Morris told them that it was so close to noon they should go to lunch and that they could set up the boom in the afternoon. However, Morris, with the help of his steel crew, appears to have assembled the boom. After the boom had been assembled, Morris gave arm and hand signals directing the movement of the truck crane to the point where work was to be commenced. At first the crane was used to install prefabricated steel trusses in horizontal positions and prefabricated steel beams in upright positions so that the steel crew could bolt them in place. Morris had blueprints of the construction project to enable him to identify the various prefabricated steel pieces and direct their installation in the proper places. Since Pasma, the crane operator, could not hear oral instructions because of the noise in the crane cab, he was directed entirely by a standard system of arm and hand signals used in the building trade. Signals are used to raise and lower the boom, to swing it right or left, to give or take up slack in the hoisting cable, to hold the load, and to direct all movements of the crane. From the nature of the work, it appears that the success of the work and the safety of the steel crew, working at points where the steel pieces were being joined, were greatly dependent upon the precision with which the crane operator was able to respond promptly and accurately to the arm and hand signals. The steelworkers rely upon the

crane operator to watch for signals at all times and to move the crane precisely in accord with the signals given. He is not to move the crane except upon signal, but must be ready to respond when a signal is given. Every movement of the crane, boom, or cable must be made in response to a signal to either the oiler or the crane operator. It appears to be conceded that Pasma was a competent and experienced operator. Even plaintiff admitted that Pasma never mismoved the crane as far as he observed. Although a regular signalman is frequently employed for the sole purpose of communicating orders to the crane operator, on this particular project the signals were given either by Morris, the steel foreman, or by one of the steelworkers. Plaintiff testified that, although it was not his duty to do so, he knew that he had a right to give signals.

The steel crew, the crane operator, and the oiler, working under the direction of Morris, the steel foreman, completed their work on the north section of the aluminum company's plant about 1:30 Tuesday afternoon and were to follow it by the installation of a similar steel framework for the south section of the plant. To perform this job, it was necessary that four steel truss sections, each 26 feet long and weighing about four tons, which were lying to the north of the plant, be moved to the south side. Marvin Brunkow, the general foreman of the project, conferred with Morris, the steel foreman, relative to the placement of the trusses. Morris walked with Brunkow to the southeast corner of the building, and there Brunkow indicated some timbers on which to place the trusses. Morris then returned to the north side of the building and directed the placement of the truck crane to pick up the trusses and the attachment of the trusses to the crane's cable.

About the same time that the crane cable was fastened to the steel trusses, plaintiff came down off the steel framework, having completed the work of installing trusses at the north end of the building. He observed the steel trusses being attached to the crane. Morris, Brunkow, plaintiff, and two other steelworkers were present at this time. Plaintiff admitted hearing that some discussion relative to the movement of the trusses had taken place, but denied

having any accurate knowledge about the matter. It is admitted that Pasma, the crane operator, could not have heard this conversation, and it does not appear that he knew what he was to do next except as he was given signals. After the trusses were attached to the crane, Pasma was given a signal to raise the load to an elevation of about three feet and to hold it there.

The trusses were attached to the crane so that the boom of the crane and the trusses were extended off the rear of the truck in prolongation of its length. The boom was elevated from the ground at about a 60-degree angle and at that elevation extended about 50 feet into the air. There was a distance of about 10 or 15 feet from the rear of the truck to the rear end of the trusses. In order to prevent them from swaying unduly, a steelworker named Knutson held onto the end of the trusses nearest to the rear of the truck, and plaintiff held onto the bundle of trusses at the far end. Thus, as the truck moved down the road, plaintiff was facing in the direction of travel, and Pasma, the crane operator, was facing to the rear. At a signal from Morris, the truck began the movement to the south end of the building.

The route of the truck was along a public street which curves around the northeast corner of the building and then runs roughly parallel with its east side. The Northern States power line is also located east of the plant; but, whereas the side of the building and the public road run almost true north, the power line approaches the building at an angle from the northeast and parallels it for only a relatively short distance at the south end. Thus, after the truck rounded the northeast corner and proceeded south, the farther it traveled the closer it came to the power lines. With plaintiff and Pasma situated as they were, plaintiff was facing the power line and Pasma had his back to it until the truck crane rounded the northeast corner. Thereafter, the power line was on plaintiff's left and on Pasma's right. When the truck, which had been traveling at approximately two miles per hour, reached the southeast corner of the building, Morris, who had been walking alongside the driver, signaled for the driver (Pastwa) to stop.

At this moment the situation was this: The truck crane was standing on the west edge of the street facing south with the boom of the crane extending north, while the trusses were hanging lengthwise on the end of the cable in a north-south direction. Plaintiff was on the north end of the trusses, and Knutson was on the south end, nearest the truck. Pasma was in the cab of the crane facing north. The Northern States wires ran roughly parallel with the road and were about six or eight feet east of the east edge of the public street and about 33 feet above the ground. The distance from the edge of the building to the power line was about 50 feet.

Thereafter, the evidence conflicts as to who signaled for the further movements of the crane. In any event, the crane was swung to the west a distance of about ten feet so that the trusses were directly above some timbers placed along the west side of the street. Pasma testified that Morris gave him the signal to swing west, but Morris denied it. Plaintiff testified that he did not know who gave this signal. Since it is clear that plaintiff, Morris, and Knutson were the only persons in a position to give the signal, and, since there is no claim that Knutson gave it, we are left to conclude either that plaintiff or Morris gave the signal or that Pasma moved without signal.

Morris testified that after the truck was stopped in this position he walked from the east side of the truck, crossed in front of it, and told plaintiff and Knutson to get some blocks and place the trusses on them at the side of the road so as not to obstruct traffic. However, Morris did not specify on which side of the road the trusses were to be placed. Plaintiff did not recall receiving any instructions from Morris, but Pasma testified that he saw Morris talking to him. Morris then walked around the southeast corner of the building to look for some other steel pieces.

Pasma and another witness testified that the trusses were then placed upon the blocks on the west side of the road, but again plaintiff did not recall that this was done. However, there is no conflict that the next movement of the boom of the crane was to the east. Pasma and another witness testified that plaintiff signaled for this

movement, but he denied it. Morris was not present when this movement took place; and, although Knutson was present, there is no testimony that he gave any signal. As the crane moved from west to east, plaintiff held onto one end of the load to steady it. He walked along with the load toward Northern States' wires as the boom of the crane moved the load from the west to the east side. of the road, a distance of approximately 30 feet. At some point in the eastward movement a portion of the crane contacted the power line. As soon as Pasma heard the noise made by the contact, he swung the crane back to the west. What happened as a result of the contact has already been stated.

As between Lambert [3] and plaintiff, the principal issue on appeal is whether, at the time of the accident and with reference to the work he was then doing, Pasma, the crane operator, was a loaned servant in the employ of the Arnold company. The jury found that he was not. Although this determination is normally one of fact for the jury, it is well established that where there is no dispute as to controlling facts and no jury would be entitled to find that there was not a loaned-servant relationship the question becomes one of law for the court.[4] It is undisputed that, insofar as Pasma in fact became a loaned servant, the liability for his negligent act was shifted from Lambert and rested upon the Arnold company under the doctrine of *respondeat superior*.

Though well established, the loaned-servant principle has proved troublesome in its application to individual fact situations. The criteria for determining when a worker becomes a loaned servant are not precise; as a result, the state of the law on this subject is chaotic.[5] Respectable authority for almost any position can be

---

[3]For convenience of reference, the name "Lambert" will be used hereinafter to designate both J. M. Lambert and his successor, Truck Crane. Service Company.

[4]Cayll v. Waukesha G. & E. Co. 172 Wis. 554, 179 N. W. 771; Mansfield v. Andrew Murphy & Son, 139 Neb. 793, 298 N. W. 749; Devaney v. Lawler Corp. 101 Mont. 579, 56 P. (2d) 746; McFarland v. Dixie M. & E. Co. 348 Mo. 341, 153 S. W. (2d) 67, 136 A. L. R. 516.

[5]Cardozo, *A Ministry of Justice* (1921) 35 Harv. L. Rev. 113, 121.

found, for even within a single jurisdiction the decisions are in conflict. The supreme court of Wisconsin, to whose law we must look in this case,[6] once stated: ·

"We shall not attempt to reconcile the decisions of this and other courts in this field. They are, to some extent at least, irreconcilable." [7]

Since decisions on this subject often turn on narrow fact distinctions, it is regrettable that a rather extensive examination of Wisconsin loaned-servant cases has failed to reveal a case on all fours with the one at bar. The absence of any decision directly in point makes this case largely one of first impression under Wisconsin law.

In the main, courts have relied on two tests in determining when a worker becomes a loaned servant. The first of these is the "whose business" test. [8] It asks: At the time of the negligent act, which employer's business was being done or furthered? The answer to the question names the responsible employer. This test is practically valueless where, as in the instant case, the general employer's business consists of furnishing men to perform work for the special employer, because by doing his job the worker is necessarily furthering and doing the business of both employers. If the test is meant to determine whether or not the worker's status was that of a servant of an independent contractor at the time of the negligent act, then

---

[6]It is a well-settled general rule governing conflict of laws that the law of the state where the injury occurs governs the determination of liability in actions for negligence. Anderson v. State Farm Mut. Auto. Ins. Co. 222 Minn. 428, 24 N. W. (2d) 836; Darian v. McGrath, 215 Minn. 389, 10 N. W. (2d) 403; E. I. Du Pont De Nemours & Co. Inc. v. Frechette (8 Cir.) 161 F. (2d) 318; 1 Dunnell, Dig. & Supp. § 1541; 21 Minn. L. Rev. 204. ·

[7]Rhinelander Paper Co. v. Industrial Comm. 206 Wis. 215, 217, 239 N. W. 412, 413.

[8]Cayll v. Waukesha G. & E. Co. 172 Wis. 554, 179 N. W. 771; Spodick v. Nash Motors Co. 203 Wis. 211, 232 N. W. 870; Western W. & I. Bureau v. Industrial Comm. 212 Wis. 641, 250 N. W. 834; Devaney v. Lawler Corp. 101 Mont. 579, 56 P. (2d) 746; Standard Oil Co. v. Anderson, 212 U. S. 215, 29 S. Ct. 252, 53 L. ed. 480.

it only begs the question and must depend for its answer on the "control" test, which we shall discuss next. [9]

The so-called "right of control or direction" test assumes to place the responsibility for the servant's negligence upon the employer having the right to control his actions at the time the negligent act occurs. The theoretical basis for this test is probably the desire to impose the liability upon the employer who was in the best position to prevent the injury. Although this may be considered inconsistent with the liability-without-fault nature of *respondeat superior,* [10] the control test has received widespread approval from the courts. [11]

One danger in using control as a test lies in failing to define sufficiently the scope and the meaning of the term. In a general sense, both employers frequently have powers over the employe which may

---

[9]In Wicklund v. North Star Timber Co. 205 Minn. 595, 599, 287 N. W. 7, 10, where this court was confronted with a case involving problems of both loaned servant and independent contractor, numerous cases were reviewed, and, with reference to determining whether trucks and drivers were employed in a status of independent contractor, it was stated: "The test of the relationship is right of control." See, Kolman v. Industrial Comm. 219 Wis. 139, 262 N. W. 622; Employers Mut. Liability Ins. Co. v. Brower, 224 Wis. 485, 272 N. W. 359.

[10]See, Seavey, *Speculations as to "Respondeat Superior,"* Harvard Legal Essays 433.

[11]Cayll v. Waukesha G. & E. Co. 172 Wis. 554, 179 N. W. 771; Spodick v. Nash Motors Co. 203 Wis. 211, 232 N. W. 870; Western W. & I. Bureau v. Industrial Comm. 212 Wis. 641, 250 N. W. 834; Roe v. Winston, 86 Minn. 77, 90 N. W. 122; Saint Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N. W. (2d) 637; see, Chapman v. Peoples Ice Co. 125 Minn. 168, 172, 145 N. W. 1073, 1075; Errickson v. F. W. Schwiers, Jr., Co. 108 N. J. L. 481, 158 A. 482; Gaston v. Sharpe, 179 Tenn. 609, 168 S. W. (2d) 784; Mansfield v. Andrew Murphy & Son, 139 Neb. 793, 298 N. W. 749; McFarland v. Dixie M. & E. Co. 348 Mo. 341, 153 S. W. (2d) 67, 136 A. L. R. 516; Bojarski v. M. F. Howlett, Inc. 291 Pa. 485, 140 A. 544; Rourke v. White Moss Colliery Co. [1877] 2 C. P. D. 205; Donovan v. Laing, Wharton, and Down Const. Syndicate, Ltd. [1893] 1 Q. B. 629; Bain v. Central Vermont Ry. Co. [1921] 2 A. C. 412; cf. Mersey Docks and Harbour Board v. Coggins & Griffith, Ltd. [1947] A. C. 1.

be considered elements of control. [12]   The control possessed by the general employer may be more remote than that of the special employer, but nevertheless it has real force behind it.   An example may be found in the instant case.   Among other things, Lambert selected Pasma, could discharge him, paid his wages, and administered such matters as social security, workmen's compensation, and income tax withholding.   He also unquestionably had the exclusive right to direct how the truck crane should be cared for.   All these may properly be considered elements of control.   On the other hand, as we shall see, the Arnold company exercised detailed on-the-spot control over the actual construction work done by Pasma.

Cases which require a complete surrender of control by the general employer as a condition precedent to finding the worker a loaned servant fail to recognize that it is the fact that dual control exists which often causes the loaned-servant problem.   Such cases have been ably criticized in Wylie-Stewart Mach. Co. v. Thomas, 192 Okl. 505, 507, 137 P. (2d) 556, 558.

"* * * there are decisions from states that read literally would negative * * * [the loaned-servant] principle.  For instance, it is said that (1) unless the lending master surrenders all control, and (2) unless the servant renounces all obedience to the master who hired and loaned him, and (3) unless the lending master surrenders the power to discharge the employee and the borrowing master has the power to discharge the servant from both employments, there is no release of the hiring master from responsibility for the servant's negligence under the rule of respondeat superior. * * *

"To us, when the principle is tested by the elements stated above, the result is the destruction of the principle.  When a master turns an employee to another's service under the tests outlined, it is not a loan of the servant, it is a complete giving up of the servant, a termination of any relationship between the hiring master and the servant. It would be an out and out change of employment. It would be a discharge from one master and a hiring by another."

[12]Smith, *Scope of the Business: The Borrowed Servant Problem,* 38 Mich L. Rev. 1222.

· Since both employers may each have some control, there is nothing logically inconsistent, when using this test, in finding that a given worker is the servant of one employer for certain acts and the servant of another for other acts. Excellent examples of this are the cases which hold a machine operator performing work for another to be the servant of the machine owner in the care and maintenance of the machine, but the servant of the borrower in the operation of it. [13] The crucial question is which employer had the right to control the particular act giving rise to the injury. In this connection, Restatement, Agency, § 227, *comment a*(2), states:

"* * * Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, *as to the act in question,* he is acting in the business of and under the direction of one or the other." (Italics supplied.)

But, even after limiting the inquiry to the particular act giving rise to the injury, the task of defining the meaning of control remains. Detailed authoritative control must be distinguished from mere designation of work or suggestions made incident to encouraging coöperation between related activities on large projects.

The orders of the borrowing employer must be commands and not requests if the worker is to be found to be a loaned servant. [14] However, it is not necessary, as plaintiff contends, that the penalty for

[13]Hilgenberg v. Elam, 145 Tex. 437, 198 S. W. (2d) 94; McFarland v. Dixie M. & E. Co. 348 Mo. 341, 153 S. W. (2d) 67, 136 A. L. R. 516. See, Wagner v. Larsen, 174 Wis. 26, 182 N. W. 336, where defendant rented his team, sleigh, and driver to a coal company to be used in making deliveries. It was held that the driver was defendant's servant in driving, managing, and caring for the team; but the opinion suggested that in selecting his route, sprinkling coal, and making collections he was also the servant of the coal company, and that if he had driven over someone's lawn in approaching a customer's dwelling the coal company would have been liable.

[14]Standard Oil Co. v. Anderson, 212 U. S. 215, 29 S. Ct. 252, 53 L. ed. 480. See, also, Charles v. Barrett, 233 N. Y. 127, 135 N. E. 199.

disobedience be discharge or discipline. · The right to discharge is one element in measuring the authoritativeness of the order, but it should not be made decisive. [15] Despite the contrary holding in a similar case, [16] where the safety of other workers and the efficiency of the operation depend upon absolute obedience to the orders of the hirer, it seems to flaunt reality to consider such orders mere requests aimed at getting coöperation among the workers.

Authority to designate only the result to be reached is not sufficient under the control test. There must be the authority to exercise detailed authoritative control over the manner in which the work is to be done. The line of cases known as the "carriage cases" will illustrate this distinction amply for our purposes. [17] These cases hold that where a person hires an automobile and driver and merely designates the destination he wishes to reach, the route to be taken, or even the approximate speed he wishes to travel, the driver does not become a loaned servant for purposes of *respondeat superior*. Unless there is detailed control over the manner in which the driver guides the car over the road, no responsibility devolves upon the hirer. [18]

---

[15]See, Spodick v. Nash Motors Co. 203 Wis. 211, 232 N. W. 870; Devaney v. Lawler Corp. 101 Mont. 579, 56 P. (2d) 746.

[16]Standard Oil Co. v. Anderson, *supra*, footnote 14.

[17]In Donovan v. Laing, Wharton, and Down Const. Syndicate, Ltd. [1893] 1 Q. B. 629, 634, the cases of Laugher v. Pointer [1826] 5 B. & C. 547, 108 Reprint 204, and Quarman v. Burnett [1840] 6 M. & W. 499, 151 Reprint 509, were referred to as the "carriage cases." Since that time, numerous cases involving a similar fact situation have arisen where the rule of the carriage cases has been applied and where one of the English cases has been cited. See, Wagner v. Larsen, 174 Wis. 26, 30, 182 N. W. 336, 338; Meyers v. Tri-State Auto. Co. 121 Minn. 68, 71, 140 N. W. 184, 185, 44 L.R.A.(N.S.) 113; Driscoll v. Towle, 181 Mass. 416, 419, 63 N. E. 922, 923. For more recent decisions on the "carriage cases" rule, see Hoefer v. Last, 221 Wis. 102, 266 N. W. 196; Boehck Equipment Co. v. Industrial Comm. 246 Wis. 178, 16 N. W. (2d) 298; Antonelly v. Adam, 175 Minn. 438, 221 N. W. 716.

[18]Where the hirer does have detailed control over the driver and has the right to tell him how to drive, the driver does become the hirer's servant. Irwin v. Klein, 271 N. Y. 477, 3 N. E. (2d) 601.

The application of these principles to the instant case compels the conclusion that Pasma, the crane operator, was under the detailed authoritative control of the Arnold company exclusively with respect to the act which caused the injury. Every movement of the crane while it was being used on the job was directed through hand signals by an Arnold company employe. Signals were given indicating when and how far to swing the boom of the crane, when to stop the movement, when and how far to raise or lower the boom, and when and how far to slacken or tighten the hoisting cable. Without these signals, Pasma lacked the knowledge or authority to make a move, because only Morris, the Arnold company's steel foreman, with the aid of his blueprints, knew the pattern and progress the work was to take. More detailed control can hardly be conceived. The crane operator was virtually an automatic eye which caused the machinery of the crane to respond to signals given by the Arnold company's employes.

There can be no doubt that these signals carried the force of command. The work of the crane involved moving heavy pieces of steel to within inches of workmen standing on narrow platforms 10 or 20 feet above the ground. A hesitant response or disobedience to a signal jeopardized their lives, and Pasma was fully aware of it. In such a situation, the orders given, viewed realistically, must be considered authoritative. In this connection, it is interesting to compare this case with the so-called "hospital cases."[19] In the St. Joseph's Hospital case (cited in footnote 19), this court held that a nurse employed by a hospital was a loaned servant when acting under the supervision of a surgeon in the operating room, because the complete reliance of the patient upon the surgeon made it essential that the surgeon have absolute control of all those in attendance. Although these cases are not strictly analogous with the instant case, the reliance of the steelworkers on the signalman for their safety would seem to require that

[19]See, Saint Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N. W. (2d) 637; Wallstedt v. The Swedish Hospital, 220 Minn. 274, 19 N. W. (2d) 426; Aderhold v. Bishop, 94 Okl. 203, 221 P. 752, 60 A. L. R. 137.

he possess a comparably high degree of control over the crane movements.

It is not material for the purposes of this case whether or not the negligent movement of the crane was actually made in response to a signal by an Arnold company employe. If the Arnold company had the exclusive right to direct all movements of the crane, then Lambert did not; and, when he was moving the crane, Pasma was a loaned servant of the Arnold company. The absence of actual control at the time of the negligent act does not alter its liability. It is to be remembered that the ultimate basis for imposing liability upon either employer is *respondeat superior,* which requires no fault on the part of the responsible employer. [20] The right to control is the basis for imposing this responsibility, and the actual control exercised is merely evidence of which employer held that right. Actual control becomes material only when an attempt is made to hold an employer personally liable as procurer of the negligent act.

After a careful review of the record and in light of the numerous cases and authorities examined, we are of the opinion that as a matter of law Pasma was a loaned servant in the employ of his special employer, the Arnold company, with respect to the negligent act causing plaintiff's injury.[21] It follows from the cases heretofore

[20] Seavey, *Speculations as to "Respondeat Superior,"* Harvard Legal Essays 433.

[21] The conclusion here reached is widely supported in other jurisdictions. See, Gallagher T. & S. Co. v. Public Service Co. 111 Colo. 162, 138 P. (2d) 926; McFarland v. Dixie M. & E. Co. 348 Mo. 341, 153 S. W. (2d) 67, 136 A. L. R. 516; Devaney v. Lawler Corp. 101 Mont. 579, 56 P. (2d) 746; Mansfield v. Andrew Murphy & Son, 139 Neb. 793, 298 N. W. 749; Errickson v. F. W. Schwiers, Jr., Co. 108 N. J. L. 481, 158 A. 482; Gaston v. Sharpe, 179 Tenn. 609, 168 S. W. (2d) 784; Hilgenberg v. Elam, 145 Tex. 437, 198 S. W. (2d) 94; Coker v. Gunter, 191 Va. 747, 63 S. E. (2d) 15. *Compare* Wylie-Stewart Mach. Co. v. Thomas, 192 Okl. 505, 137 P. (2d) 556, *with* Hodges v. Holding, 204 Okl. 327, 229 P. (2d) 555, and *compare* Bojarski v. M. F. Howlett, Inc. 291 Pa. 485, 140 A. 544, *with* Pennsylvania S. & R. Co. v. Duffin, 363 Pa. 564, 70 A. (2d) 270, 17 A. L. R. (2d) 1384. For recent annotation on this subject, see Annotation, 17 A. L. R. (2d) 1388, 1442.

cited that Lambert, the general employer, is not liable for plaintiff's injury, and judgment must be entered in Lambert's favor.

■ In view of our decision that Lambert is entitled to judgment in his favor, there remains for consideration only those assignments of error which pertain to Pasma's personal liability. It is clear under the Wisconsin law that if one coemploye negligently injures his fellow employe it is no defense in a suit against him to assert that both were employed under one master. Lawton v. Waite, 103 Wis. 244, 79 N. W. 321, 45 L. R. A. 616; McGonigle v. Gryphan, 201 Wis. 269, 229 N. W. 81.

The only errors assigned relative to Pasma's personal liability are with respect to the court's instructions to the jury on the issues of plaintiff's contributory negligence and damages. The sufficiency of the evidence to sustain the jury's separate findings as to the comparative negligence of the respective parties and plaintiff's damages has not been questioned.

■ Although a portion of the court's instructions on contributory negligence, standing alone, might give the impression that the court confused the doctrine of contributory negligence with assumption of risk, upon considering the instructions given on this issue as a whole, we find no prejudicial error presented.

■ The court's failure to instruct the jury that in determining damages for loss of future earnings it should allow only the present value of such future earnings is also urged as reversible error. No request for such an instruction appears to have been made until after the court had concluded its charge to the jury. This court has frequently held that a requested instruction proffered orally at the conclusion of the charge comes too late. 6 Dunnell, Dig. & Supp. § 9772, and cases cited. This rule is particularly applicable where, as here, the instruction requested is not deemed essential to the jury's consideration of the controlling issues in the case. Moreover, since it is not contended that the damages found by the jury were excessive and there is nothing in the record before us to indicate that loss of future earnings was, in fact, included as an element of damage in

the sum found by the jury, any error in this respect cannot be assumed to have been prejudicial.

Although the assignments of error attack the admission in evidence against Lambert of General Order No. 3537 on Safety in Construction issued by the Wisconsin industrial commission and certain provisions of the Wisconsin Safe Place Statute, there is no occasion for us to consider their applicability to the facts of this case. Since Lambert's liability is predicated solely upon the doctrine of *respondeat superior* and we have determined that he is entitled to judgment as a matter of law, and since neither the trial court's admission in evidence of said General Order and statute against Pasma nor its instructions to the jury with reference thereto have been assigned as error on appeal, there remains nothing further before us to consider. See, 1 Dunnell, Dig. & Supp. § 358.

It follows that the jury's findings on the issues of comparative negligence and damages must stand and that the order of the trial court denying Pasma's motion in the alternative for judgment or a new trial must be affirmed. Accordingly, it becomes unnecessary for us to decide whether Northern States Power Company is entitled to a dismissal of the appeal as to it. Flemming v. Thorson, 231 Minn. 343, 43 N. W. (2d) 225.

Reversed as to appellants J. M. Lambert and Truck Crane Service Company with directions to enter judgment in their favor.

Affirmed as to appellant August Pasma.

So ordered.

MR. JUSTICE FRANK T. GALLAGHER took no part in the consideration or decision of this case.