669 F.2d 525
 MINNKOTA POWER COOPERATIVE, INC., a corporation; and
Baukol-Noonan, Inc., a corporation, Appellees,
v.
MANITOWOC COMPANY, INC., a corporation, Appellant,
v.
SANDERSON AND PORTER, Appellee.
 No. 80-1923.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 16, 1981.
Decided Jan. 13, 1982.
 
 David B. Sogard, In-House Counsel, Minnkota Power Co-op., Inc., Grand Forks, N. D., A. James Anderson, argued, of Robins, Zelle, Larson & Kaplan, Atlanta, Ga., for Minnkota Power Co-op., Inc., and Baukol-Noonan, Inc.
 Lowell A. O'Grady, argued, of O'Grady & Morley, Grand Forks, N.D., for The Manitowoc Co., Inc.
 Robert A. Wheeler, argued, of McGee, Hankla, Backes & Wheeler, Minot, N.D., for Sanderson and Porter, Inc.
 Before BRIGHT and ROSS, Circuit Judges; and DEVITT, Senior District Judge.*
 BRIGHT, Circuit Judge.
 
 
 1
 Manitowoc Company, Inc., (Manitowoc) appeals from an adverse judgment entered after a jury awarded Minnkota Power Cooperative, Inc., (Minnkota) and Baukol-Noonan, Inc., (Baukol-Noonan), $217,300 in damages, and from a separate judgment dismissing Manitowoc's third party claim against Sanderson and Porter, Inc., (Sanderson and Porter). Minnkota and Baukol-Noonan brought this action against Manitowoc for damages sustained when a construction crane operated by a Manitowoc employee, but owned by Peter Kiewit Sons' Company, Inc., (Kiewit), struck an overhead electric power line running between Minnkota's power plant and Baukol-Noonan's coal mine. This power interference damaged Minnkota's transformer and deprived Baukol-Noonan of electricity necessary to continue its coal mining operation. The judgment represented damages of $189,700 to Minnkota and $27,600 to Baukol-Noonan.
 
 
 2
 In response to Manitowoc's numerous assertions of error, we grant a partial new trial to determine whether to attribute fault to Kiewit under an aspect of the borrowed servant doctrine and, if necessary, an appropriate reduction of damages against Manitowoc. We affirm the judgments in other respects.
 
 
 3
 I. Procedural Background.
 
 
 4
 Minnkota and Baukol-Noonan brought this action[1] for damages against Manitowoc and Kiewit, alleging the negligence of both defendants. Manitowoc had sold Kiewit the crane which caused the accident. Manitowoc impleaded Sanderson and Porter as a third party defendant, alleging that Sanderson and Porter's negligent design of the Minnkota power plant contributed to plaintiffs' damages. Prior to trial, plaintiffs settled with Kiewit for $7,000 and released Kiewit from all liability claims.
 
 
 5
 We recognize that such a settlement may diminish the amount of damages plaintiffs may recover from the remaining defendants. The Supreme Court of North Dakota has determined that in certain instances a plaintiff's damages must be reduced by an amount proportionate to the percentage of negligence attributed by the factfinder to the released tortfeasor. See Bartels v. City of Williston, 276 N.W.2d 113 (N.D.1979).[2]
 
 
 6
 The trial court submitted to the jury the issue of Manitowoc's negligence and plaintiffs' damages, and dismissed Manitowoc's third party negligence claim against Sanderson and Porter for insufficient evidence. The court refused to instruct the jury to determine Kiewit's relative degree of fault on the ground that Manitowoc failed to prove any causal negligence attributable to the released codefendant.
 
 
 7
 Before trial, the court ruled that Manitowoc could not call experts to testify concerning Sanderson and Porter's allegedly negligent design of the Minnkota transformer. The court determined that allowing the expert testimony after Manitowoc failed to make timely disclosure of its experts' identity and the basis of their proposed testimony would prejudice the plaintiffs.
 
 
 8
 After trial, Manitowoc moved for a new trial, asserting twenty-two alleged errors in the trial court's rulings, and, alternatively, sought a setoff on the judgment for the $7,000 plaintiffs received in their settlement with Kiewit. The trial court denied these motions and on this appeal Manitowoc reasserts several allegations of error made in its motions for new trial and partial setoff.
 
 
 9
 Manitowoc raises the following claims of error on appeal:
 
 
 10
 1) The trial court abused its discretion in barring Manitowoc from calling expert witnesses to testify regarding Sanderson and Porter's allegedly negligent design of the transformer.
 
 
 11
 2) The trial court erred in several evidentiary rulings.
 
 
 12
 3) The trial court erred in its instruction on proximate cause.
 
 
 13
 4) The trial court erred in refusing to instruct on negligence attributable to the released defendant Kiewit, by imputing the negligence of a Manitowoc employee to Kiewit under the joint enterprise theory or the borrowed servant doctrine.
 
 
 14
 5) The trial court erred in refusing to set off the $7,000 settlement against plaintiffs' recovery.
 
 
 15
 After reviewing the record, we have determined that the trial court erred in refusing to instruct on the borrowed servant doctrine as a basis for attributing fault to the released codefendant, Kiewit, and for reducing the damages assessed against Manitowoc. See Bartels v. City of Williston, supra, 276 N.W.2d at 122.
 
 
 16
 Accordingly, we remand for a new trial only on the issue of Kiewit's liability under the borrowed servant doctrine.
 
 
 17
 II. Factual Background.
 
 
 18
 Prior to the incident in question, Square Butte Cooperative (Square Butte) began building a power plant on property adjacent to Minnkota's Power Station, near Center, North Dakota. Square Butte hired Kiewit to do the excavation and foundation work for the plant. To perform that work, Kiewit purchased a large crane from Manitowoc, a crane manufacturing company. Pursuant to the purchase contract, Manitowoc sent one of its employees, Carman Way, to supervise assembly of the crane at the construction site and to instruct Kiewit's employees in the operation of the crane.
 
 
 19
 According to the record, the crane's purchaser ordinarily supplies an operator to assist in the operation and movement of the crane unit during assembly. Because Kiewit did not have an operator available, Kiewit's equipment superintendent asked Way to operate the crane. Way ran the crane for Kiewit during its assembly and parked it near an earthen embankment upon completion of assembly.
 
 
 20
 On Monday, July 21, 1975, Way again operated the crane to move it away from the embankment so that Kiewit could put it to work. To move the crane, Way had to raise and rotate the boom. During this movement, Way hit the overhead power line running from the start-up transformer on Minnkota's power plant to Baukol-Noonan's coal mine. The collision damaged the transformer, causing the mine to close until the transformer could be repaired.
 
 
 21
 With this factual background, we discuss the issues presented on this appeal.
 
 
 22
 III. Discovery Sanction.
 
 
 23
 Manitowoc complains that the district court abused its discretion by refusing to permit Manitowoc's expert witnesses to testify regarding the allegedly negligent design of Minnkota's transformer. In March 1979, Manitowoc had failed to answer fully plaintiff's interrogatories concerning Manitowoc's expert witnesses and any reports it had on the design of the transformer. Manitowoc answered by asserting that it had made no decision on whether to use an expert witness, and that its report on the transformer was protected as work product and because it contained communications protected by the attorney-client privilege.
 
 
 24
 Although the trial court ordered discovery completed by December 20, 1979, Manitowoc did not file supplemental responses to the March 1979 interrogatories until March 12, 1980. Plaintiffs moved to strike the responses and to bar Manitowoc's expert testimony. In a pretrial hearing on April 2, 1980, the court excluded Manitowoc's proposed expert testimony because Manitowoc's failure to comply with the discovery deadline would prejudice the plaintiffs.
 
 
 25
 Manitowoc asserts that both Minnkota and Baukol-Noonan failed to comply with discovery rules and rules of court, and, thereafter, ambushed Manitowoc by moving before trial to exclude Manitowoc's expert testimony. In excluding this testimony, Manitowoc alleges that the trial court precluded it from establishing Sanderson and Porter's contributory negligence. Moreover, Manitowoc asserts that introduction of this expert testimony would not have prejudiced the presentation of plaintiff's case because plaintiffs earlier had received information about the substance of the proposed testimony.
 
 
 26
 The Federal Rules of Civil Procedure impose a duty on parties to supply and supplement answers to interrogatories regarding the names of expert witnesses they expect to call, and the basis for, and substance of, the expert testimony. See Fed.R.Civ.P. 26(b)(4) and (e). Manitowoc possessed the information required to answer the March 1979 interrogatories long before the close of discovery on December 20, 1979. If Manitowoc intended to use these experts, it was required to answer the interrogatories before the discovery deadline. Had the court not struck the answers and barred the testimony, plaintiffs and third party defendant, Sanderson and Porter, may have found it necessary to take further depositions. We cannot say that the court abused its discretion by imposing discovery sanctions in this instance. See Havenfield Corp. v. H & R Block, Inc., 509 F.2d 1263, 1272 (8th Cir.), cert. denied, 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975).
 
 
 27
 IV. Evidentiary Matters.
 
 
 28
 We also conclude that Manitowoc's assertions of error in other evidentiary rulings lack merit.
 
 
 29
 Manitowoc contends that the trial court should have permitted it to introduce a copy of a complaint plaintiffs had previously filed against Moloney Electric Corporation, in which plaintiffs charged Moloney with negligent manufacture of Minnkota's transformer. The court properly ruled the complaint irrelevant to these proceedings.
 
 
 30
 Manitowoc also contends that the trial court should have permitted it to introduce the deposition testimony of Sanderson and Porter's chief electrical engineer, to impeach the testimony of another employee of Sanderson and Porter. The court refused to admit the deposition as irrelevant and for lack of a proper foundation. This ruling falls within the discretion of the trial court.
 
 
 31
 V. Borrowed Servant Doctrine.
 
 
 32
 Manitowoc requested an instruction on the borrowed servant doctrine as a basis for imputing Way's negligence to Kiewit.[3] The court refused to instruct on the borrowed servant doctrine on the ground that Manitowoc had not established that Kiewit's employees had a right to control Way's operation of the crane. We believe that the evidence viewed most favorably to Manitowoc raises a jury question on whether liability may be attributed to Kiewit under the borrowed servant doctrine.
 
 
 33
 YES_____ or NO_______
 YES_____ or NO_______
 YES_____ or NO_______
 YES_____ or NO_______
 YES_____ or NO_______
 
 
 34
 As we have already observed, Way's duties as an employee of Manitowoc included supervising assembly of the crane and boom, and instructing Kiewit's operator on the new controls.[4] His orders from Manitowoc, however, did not require him to operate the crane during assembly. That function belonged to Kiewit. At the request of Kiewit's equipment superintendent, Bill Gerioux, Way agreed to operate the crane,[5] and "walked" it from the railroad station to an area a mile away where the crane was loaded onto trucks and hauled to the power plant construction site.
 
 
 35
 After Kiewit had transported the crane unit and boom sections to the construction site for assembly, Way continued to operate the crane for Kiewit.[6] Way's testimony further indicates that Kiewit directed and controlled his operation of the crane during assembly.[7]
 
 
 36
 On Saturday, July 19, 1975, Way, along with Kiewit's employees and four employees from another contractor, completed assembly of the crane boom at the construction site. (Tr. at 710.) Way parked the newly assembled Manitowoc crane near an earthen embankment at the direction of one of the workers who had assisted in the assembly. (Tr. at 716.)
 
 
 37
 On Monday, July 21, 1975, Kiewit assigned Richard Anderson to operate the crane. Anderson and Way arrived at the construction site early on July 21, 1975, and became acquainted. Before moving the crane, Way instructed Anderson on how to operate the air controls and explained the differences between the air controls and the manual controls Anderson had previously operated. During their conversation, Anderson noted the position of the crane near the embankment and asked Way "how to get the crane out of there." (Tr. at 182.) According to Way's testimony, which Anderson's testimony confirmed in part,[8] the following conversation occurred:Q (By attorney for Manitowoc) And then what did you proceed to do after giving him a talk?
 
 
 38
 A (By Way) I asked him if he wanted me to swing it around. He said he didn't care, so I said, "Okay. I'll swing it around for you." (Tr. at 715 (emphasis added).)
 
 
 39
 As Way moved the boom, it hit the overhead electric line, causing the damage of which plaintiffs complained. The record establishes that Anderson was watching the operation of the machine at the time of the accident, and that Kiewit's oiler, Stephen Wettels, was in the vicinity.
 
 
 40
 In refusing to submit a borrowed servant instruction, the trial court relied on the right to control test set out in Nepstad v. Lambert, 235 Minn. 1, 50 N.W.2d 614 (1951). In determining whether an employee becomes a borrowed servant, the Nepstad court focused on the act that gave rise to the injury and which employer's business was furthered by the crane operator's movement of the crane.
 
 
 41
 The crucial question is which employer had the right to control the particular act giving rise to the injury. In this connection, Restatement, Agency, § 227, comment a(2), states:
 
 
 42
 " * * * Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other."
 
 
 43
 (Nepstad v. Lambert, supra, 50 N.W.2d at 721-22 (emphasis in original).)
 
 
 44
 In Ismil v. L. H. Sowles Co., 295 Minn. 120, 203 N.W.2d 354 (1972), the Supreme Court of Minnesota again focused on which employer's business was furthered during the negligent operation of a crane.
 
 
 45
 The tests of the Nepstad case were sufficiently satisfied by the evidence to compel a jury determination of whether Grobe was a loaned servant. The accident occurred in the course of pouring concrete, and that function was clearly the responsibility of Kraus-Anderson. The jury could reasonably have found that the business of Kraus-Anderson (the borrowing employer) and not Sowles (the general employer) was being furthered at the time of the negligent crane operation. (203 N.W.2d at 357-58 (emphasis added).)
 
 
 46
 Similarly, the evidence in this case provided a sufficient basis to permit a jury to consider whether Way was a borrowed servant of Kiewit. From the testimony adduced at trial, a jury could infer that Way's operation of the crane during assembly and on the morning of the accident furthered the business of Kiewit. Although Way served Manitowoc's purpose by demonstrating the controls to Kiewit's employee, Anderson, he also furthered Kiewit's business by starting to move the crane to the excavation site. Thus, a jury could find that Way's single act of moving the crane boom served the purposes of both his general employer, Manitowoc, and his borrowing employer, Kiewit. See Restatement (Second) of Agency § 226 (1957).
 
 
 47
 Moreover, a jury could infer from Kiewit's ownership of the crane and the assignment of its employees to the crane, that Kiewit possessed the right to control Way's operation of the crane at the time of the accident. Anderson, as Kiewit's operator, had the right and authority to direct Wettels, the oiler assigned to the crane, to stand lookout to guide Way's movement of the crane.[9] Kiewit's failure actually to direct Way's movement of the crane does not negate its liability. The basis for imposing liability under the borrowed servant doctrine is the right to control, not whether the borrowing employer actually exercised that right at the time of the accident. See Nepstad v. Lambert, supra, 50 N.W.2d at 623.
 
 
 48
 Thus, viewing the evidence and the reasonable inferences therefrom most favorably to Manitowoc, a jury could find that Way became Kiewit's borrowed servant for the purpose of operating the crane, and that Kiewit, through its employees, possessed the right to control Way's operation of the crane at the time of the accident.
 
 
 49
 A finding of liability based on the borrowed servant doctrine ordinarily will absolve the general employer of liability and shift total liability for the servant's negligent acts to the borrowing employer. See Ismil v. L.H. Sowles Co., supra, 203 N.W.2d at 357. A total shift in liability does not occur, however, when the servant simultaneously performs an act which falls within the scope of employment for both the general employer and the borrowing employer. See Restatement (Second) of Agency § 226 (1957).[10] Way's acting as a borrowed servant for Kiewit at the time of the accident therefore will not absolve Manitowoc from liability because, in demonstrating the controls of the crane at the time of the accident, Way also acted in the course and scope of his employment for Manitowoc. Thus, application of the borrowed servant doctrine in this case could result in apportionment of fault between Manitowoc and Kiewit, because Way's single act served the purposes of both employers. However, no judgment can be entered against Kiewit because of the release it obtained in settlement with plaintiffs.
 
 
 50
 VI. Other Issues.
 
 
 51
 We find no error in the court's instructions, apart from its refusal to instruct the jury on Kiewit's liability under the borrowed servant doctrine. An instruction on joint enterprise would not have been appropriate, because the evidence fails to show that Manitowoc and Kiewit were engaged in a mutual understanding for a common purpose. See Delgado v. Lohmar, 289 N.W.2d 479, 482 (Minn.1979).
 
 
 52
 We also find no error in the court's instructions on proximate cause and negligence.
 
 
 53
 We need not decide whether Manitowoc was entitled to a partial setoff for the $7,000 plaintiffs received in settlement from Kiewit. Manitowoc will have an opportunity to have the damages assessed against it reduced by establishing before a jury that Kiewit and Manitowoc were both at fault under the borrowed servant doctrine and section 226 of the Restatement (Second) of Agency. Should the jury reject Kiewit's liability under the borrowed servant doctrine, the district court may then reconsider whether a partial setoff is justified on the basis that Manitowoc made out a fact issue of the released defendant's negligence.
 
 
 54
 VII. Conclusion.
 
 
 55
 Accordingly, we vacate the judgment for the plaintiffs entered in this case against Manitowoc, and remand this case for trial only on the issue of whether Way functioned as a borrowed servant to Kiewit when the accident occurred. The total amount of damages and the jury finding of Manitowoc's negligence are deemed final.
 
 
 56
 Should the jury, on remand, determine that fault may be attributed to Kiewit under the borrowed servant doctrine, the court shall reduce the damages awarded against Manitowoc.[11]
 
 
 57
 Should the jury reject Kiewit's liability on the basis of the borrowed servant doctrine, the court shall again enter judgment in accordance with the original jury verdict, with allowance for a partial setoff if deemed appropriate by the district court in light of our ruling that Manitowoc raised a factual issue as to Kiewit's liability.
 
 
 58
 Accordingly, we vacate the judgment entered in favor of Minnkota and Baukol-Noonan, and remand this case for a limited new trial consistent with this opinion.
 
 
 
 *
 EDWARD J. DEVITT, United States Senior District Judge, District of Minnesota, sitting by designation
 
 
 [1]
 Plaintiffs originally filed this action in North Dakota state court. Defendants removed the case to federal court pursuant to 28 U.S.C. § 1441(a). Jurisdiction rests on diversity of citizenship and the requisite amount in controversy. 28 U.S.C. § 1332. North Dakota law governs the rights and obligations of the parties
 
 
 [2]
 In Bartels, the remaining defendant impleaded the alleged joint tortfeasor, whom plaintiff had previously released. In answering questions certified to it by the United States District Court for the District of North Dakota, the North Dakota Supreme Court ruled that when the plaintiff in good faith has released one of two or more tortfeasors liable for plaintiff's injury, the finder of fact shall determine the percentage of negligence attributable to the released tortfeasor, and the award of damages shall be reduced accordingly. 276 N.W.2d at 122. The district court applied Bartels to the present litigation, but refused to instruct the jury on the negligence of the released defendant, Kiewit, on the ground that Manitowoc failed to introduce evidence of Kiewit's negligence
 The litigation in Bartels reached this court in Bartels v. City of Williston, 629 F.2d 509 (8th Cir. 1980), but we did not address the contribution question.
 
 
 [3]
 Manitowoc's requested instruction 8 read, in part, as follows:
 An issue for you to determine is whether or not at the time the boom of the crane allegedly contacted the overhead high tension line, was Carman Way, if you find he was operating the crane at the time of the alleged contact, a loaned servant to Peter Kiewit Sons' Company, a corporation? In order for you to determine that he was, you must answer 'yes,' to each of the following questions:
 (a) Was Carman Way operating the boom of the crane at the time it contacted the overhead high tension line?
 (b) Did Carman Way actually or impliedly consent to work for Peter Kiewit Sons' Company, a corporation?
 (c) Was he performing work for Peter Kiewit Sons' Company, a corporation, at the time of the alleged incident?
 (d) At the time of the alleged contact, did Peter Kiewit Sons' Company, a corporation, have the right to control the details of how the crane demonstration would be performed?
 (e) Was the crane boom demonstration being conducted primarily for the benefit of Peter Kiewit Sons' Company, a corporation?
 
 
 [4]
 Way testified in part:
 A Well, the normal thing would be to come out to the job and set the machine up, unload it off the railroad car, or if it was trucked to the job, why, we'd have more pieces. We'd have to put it together and put the boom in and instruct the operator and oiler of any changes that they weren't used to on a machine and go to work. And that would be it.
 Q Now when you say, put the thing together, do you actually do that or how is that handled?
 A Well, the customer usually has the men to put it together. I deal with the foreman. I show him what pieces to go next, to put it together.
 Q So you don't actually-
 A No. I don't have to do it myself.
 Q You just supervise to see that it's done right?
 A Yes.
 (Tr. at 689.)
 
 
 [5]
 In response to questioning, Way testified:
 A I ran the crane. I was asked to run the crane.
 Q Why did you run the crane?
 A There was no operator there.
 Q And who asked you to run the crane?
 A Bill Gerioux.
 (Tr. at 699.)
 
 
 [6]
 Way testified as follows concerning his operation of the crane at the construction site:
 Q And did you have to operate the crane again?
 A Yes, I did.
 Q And why was that?
 A There was no, Peter Kiewit had no operator.
 Q Were your instructions the same?
 A Yes.
 (Tr. at 704.)
 
 
 [7]
 Way testified as follows:
 Q Now did you walk the crane over to where the boom sections were?
 A Yes, I did.
 Q Why did you do this?
 A I was asked to do that.
 Q And did you ask someone in particular and, if you did, say who it was?
 A I asked the superintendent if it was all right, because when I got up to where the trucks were they were all sitting there loaded. I asked Jam. J-a-m is his name.
 Q Is his first name William?
 A I couldn't tell you. All I ever remember is Jam. I asked him, "Bill had asked me to run the crane over there, I did. Do you still want me to do it here?"
 He asked me to but I didn't know if it was true or not.
 Q Then did you get directions from Mr. Jam where to go?
 A No. Bill Gerioux was there.
 Q Now you talked about, you went over to see Jam. And would you tell the Court and jury what, how he was, if you were related to Peter Kiewit and Sons, how he was, what was his role there out on the construction site?
 A Well, as far as I knew he was the head man. He was the superintendent I believe.
 (Tr. at 705-06.)
 
 
 [8]
 Anderson denied that he asked Way to move the crane, but conceded that he agreed to let Way move the crane. Any conflict in the testimony represents an issue for resolution by the jury
 Anderson testified as follows:
 Q On the morning of July 21, 1975 did Mr. Way get into the cab of the crane and operate its controls?
 A Yes, he did.
 Q Would you tell us what happened.
 A Well, to begin with we had to come an hour early because we were supposed to have the American crane moved down there and have the Manitowoc crane moved up to where it was supposed to be in time for other people to go to work, which would be 8:00 o'clock, so we come an hour early so there wasn't too many people around. That's the bad part of the whole deal. So we went over there and my oiler, Steve Wettels and me and Carman were there and we talked for a while and Carman said that-and he offered to get the crane. And I asked Carman how to get the crane out of there. He offered to get the crane out on his own.
 Q What crane?
 A The Manitowoc. He said, "Being I got this crane in this location and in this position," he said, "I'll get it out being you are not familiar with it."
 He volunteered to do that which was different than what I heard prior.
 A * * * Carman volunteered to do this on his own. And I said, "All right."
 (Tr. at 182-83.)
 
 
 [9]
 Anderson testified that the oiler should watch the crane's boom when operated near overhead power lines. (Tr. at 237.)
 The record indicates that Wettels stood on the back of the crane when Way rotated the boom. While there, his attention was diverted when the counterweight on the back of the crane struck Way's rental car, which was parked near the crane. Wettels testified that he did not know that Way intended to move the crane. Anderson, however, knew of Way's intentions. See note 11 supra. In addition, Anderson observed the overhead power line in the vicinity. (Tr. at 244-45.) Thus, Anderson might have directed Wettels to position himself in front of the crane as a lookout.
 
 
 [10]
 Section 226 of the Restatement (Second) of Agency provides that "(a) person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other."
 
 
 [11]
 Whether apportionment of liability or negligence between two masters under the theory set forth in § 226 of the Restatement (Second) of Agency should always be deemed equal, when liability under that theory is predicated on a single negligent act, is a question we leave for the district court to resolve under principles of North Dakota law