## JOSEPH J. BESCH v. VILLAGE OF ARDEN HILLS AND OTHERS.

115 N. W. (2d) 338.

May 18, 1962—No. 38,482.

*Tyrrell, Jardine, Logan & O'Brien* and *Raymond W. Fitch,* for relators.

*William B. Randall,* County Attorney, and *Thomas M. Quayle,* Assistant County Attorney, for respondent county of Ramsey.

*Robert J. Swords,* Corporation Counsel, and *Donald L. Lais,* Assistant Corporation Counsel, for respondent city of St. Paul.

*John T. Lilligren,* for respondent Besch.

MURPHY, JUSTICE.

This case is before us on certiorari to review an order of the Indus-

trial Commission reversing the finding of the referee and awarding to respondent Joseph J. Besch, who will hereinafter be referred to as the petitioner, workmen's compensation benefits against relators, the village of Arden Hills and its insurer, Insurance Company of North America. The claim for benefits asserted that at the time of petitioner's injuries the village of Arden Hills, the county of Ramsey, and the city of St. Paul were his employers. The issue for us to decide is which of the employers named is responsible for workmen's compensation. The answer turns upon an interpretation of Minn. St. 176.011, subd. 9, which makes provision for workmen's compensation for voluntary uncompensated workers engaged in peace time in the civil defense program.

From the record it appears that the petitioner was injured while directing traffic in the city of St. Paul while an American Legion parade was in progress. The petitioner is a resident of the village of Arden Hills and a member of the Arden Hills Civil Defense unit. On August 5, 1959, Kermit Hedman, sheriff of Ramsey County and director of the Ramsey County Civil Defense, addressed a communication to the Arden Hills Civil Defense groups requesting that they report for "POLICE DUTY" in connection with an American Legion parade to be held in St. Paul on August 25, 1959. They were requested to report "for duty to Les Juehrs, Chief, RCCD Police or Dep. Chiefs John Longville, Oren Hobbs or Deloy Christopherson at Parade Assembly area below State Capitol" at 6:30 p. m. on the day in question. Other civil defense units in Ramsey County were also requested to take part. Thereafter the petitioner was contacted by Melvan Fish, who was on the telephone committee of the group. The petitioner agreed to participate. On August 25, 1959, eight members of the group, including the director, met at an Arden Hills school. Each of them drove to the school individually but left together for St. Paul. No instructions were given to the members of this group before departing for St. Paul.

When the Arden Hills group arrived at the parade headquarters on the Capitol Approach, they presented themselves to Les Juehrs of the Ramsey County Civil Defense. Mr. Juehrs referred the group to a deputy chief of the Ramsey County unit, who directed the men to

their posts and advised them of their duties. The plan for assembling and routing the parade was prepared by representatives of the city of St. Paul and the Ramsey County Civil Defense office. The Arden Hills group was not consulted nor did it participate in formulating these plans. It appears that the work involved in the organization and policing of the parade was divided into two sections. The Ramsey County Civil Defense officials were in charge of the assembly area, and the St. Paul officials were responsible for the control of traffic on the parade route.

Petitioner was assigned to the assembly area controlled by the Ramsey County officials. He was placed at an intersection and instructed to divert traffic from entering the assembly area. While stationed at this point he assisted the St. Paul police for a short time in setting up a barricade at one of the intersecting streets, after which he returned to his post of duty. Shortly thereafter the petitioner and another volunteer with whom he was working observed that cars were moving around the barricade, causing a traffic jam. To correct this situation they moved to the intersection below the barricade and began directing traffic. This was on the boundary line of the assembly area. There is no direct evidence as to whether this activity was for the purpose of keeping traffic out of the assembly area or the parade route. In any event, while directing traffic the petitioner was injured, causing the disability for which he seeks compensation.

The village of Arden Hills and its insurer, the Insurance Company of North America, agreed to pay compensation benefits to petitioner subject to the determination of the Industrial Commission as to the employer at the time the accident occurred. The referee held that the petitioner was an employee of the county of Ramsey at the time of the accident. On appeal to the Industrial Commission, the commission adopted the findings of the referee to the effect that the petitioner became temporarily totally disabled for a period of 27 weeks and sustained permanent partial disability as a result of the accident but held that the injuries sustained arose out of and in the course of employment by the village of Arden Hills. It concluded that, since service or training duty under the Minnesota Civil Defense Act might take a volunteer from one political subdivision to another, the munici-

pal unit to which the volunteer is attached retains control over him wherever he may be engaged in civil defense work. It stated that, .in the absence of more specific legislation, a contrary holding could lead to "nothing but lengthy litigations."

Because of the unusual character of the employment, some reference should be made to the provisions of law which give to the volunteer civil defense worker the status of an employee entitled to workmen's compensation benefits. The Minnesota Civil Defense Act of 1951 (Minn. St. c. 12) contains broad provisions relating to the preservation of lives and property by volunteer civil defense units throughout the state in the event of "enemy attack, sabotage, or other hostile action, or from fire, flood, earthquake or other natural causes, * * * and generally to provide for the common defense and to protect the public peace, * * *." § 12.02, subd. 1. Section 12.25 provides that each political subdivision of the state is authorized to establish a civil defense organization under a director to be appointed by and subject to the control of the municipal authority. It is contemplated that each local organization shall perform its functions within the territorial limits of the political subdivision within which it is organized. Provision is also made for the establishment of a county civil defense organization which has jurisdiction, so far as applicable here, to coordinate "the activities of and may assist in the training of civil defense organizations" within the county. Recognizing that the civil defense work is wholly voluntary and that provisions should be made for compensation of those sustaining injuries by reason of participation in such work, the legislature adopted § 176.011, subd. 9, which provides in part:

"Voluntary uncompensated workers engaged in peace time in the civil defense program when ordered to training or other duty by the state or any political subdivision thereof, shall be employees. The daily wage of the worker for the purpose of calculating compensation payable under this chapter, shall be the usual going wage paid at the time of such injury or death for similar services where such services are performed by paid employees."

There is no dispute as to the petitioner's status as an employee.

It is agreed by all parties that the employee is entitled to workmen's compensation under the provisions of the foregoing statute. The dispute arises as to which unit of government was his employer at the time the accident occurred.[1] The village contends that either the city or county or both were employers responsible for compensation benefits.

The village of Arden Hills contends that at the time he sustained the injuries complained of the petitioner was not under its supervision or control; that it had implicitly consented that he work for the county of Ramsey; that the county of Ramsey accepted his services and was in control of the details of the work he performed; and that further the county of Ramsey received the benefits of his service. It argues that the county must be liable under the loaned-servant doctrine, which is predicated upon the common-law principle that where an employee is loaned with his consent and becomes the servant of another employer for the time being the latter may be liable under the Workmen's Compensation Act. We have discussed the loaned-servant doctrine in Nepstad v. Lambert, 235 Minn. 1, 50 N. W. (2d) 614, and Pocrnich v. Snyder Min. Co. 233 Minn. 81, 45 N. W. (2d) 794. The tests used in determining the status of an employee as a loaned servant are discussed at length in the Nepstad case and do not require repetition here.

We would be inclined to the view that the fact situation here presents cogent reasons for the application of the loaned-servant doctrine were it not for the fact that we are precluded from applying that doctrine by the stipulation of the parties and the theory upon which the case was tried before the Industrial Commission. It was conceded throughout the proceedings below and in the briefs and arguments here that, if the petitioner is to have the benefits of workmen's compensation, authority for payment thereof must be derived from

[1]Because of the stipulation of the parties, it is unnecessary for us to inquire or pass upon the issue of whether or not the petitioner was authorized or directed by his superiors to report for service to the city of St. Paul or Ramsey County or whether in fact the particular activities in which he was engaged come within the purview of Minn. St. c. 12, the Civil Defense Act.

§ 176.011, subd. 9, which grants compensation to the volunteer civil defense worker. It is agreed by the parties that authorization for coverage must come from this statute and that under the facts here coverage can apply only to injuries occurring to the volunteer while in "training or other duty." The core issue seems to be this: When a volunteer civil defense worker sustains injuries in training duty away from the municipal area to which he is attached, does the responsibility for workmen's compensation benefits shift to the governmental unit in the area where the injury occurs?[2]

It requires little argument to establish that the city of St. Paul is not responsible for benefits. It is true that the parade was held in the city of St. Paul, and we may assume that the city received benefits from the actual work performed. There is no claim, however, that the city asked that the civil defense corps units throughout the county offer their services in policing the parade. No emergency existed. The parade was not a civil defense function. It involved a local traffic problem for which a large and well-organized municipal police department was primarily responsible. The parade merely provided an opportunity for training those members of the civil defense corps who wished to volunteer. No employer-employee relationship with the city was established within the meaning of § 176.011, subd. 9.

Nor do we find anything in the record which would support the claim that there was a change of employers from the village of Arden Hills to the county of Ramsey. It is not contended that the policing of the parade was the responsibility of the county of Ramsey. The petitioner's services were not enlisted by Sheriff Hedman pursuant to his authority as the chief peace officer of the county. That authority is provided by § 387.03, which states in part:

"The sheriff shall keep and preserve the peace of his county, for which purpose he may call to his aid such persons or power of his county as he deems necessary."

---

[2]We are not concerned here with § 12.33, which relates to the right of the governor to order personnel of mobile support units from one political subdivision to another and which requires under subd. 3 that the state reimburse the sending political subdivision for payments for injuries, supplies, etc.

Neither is it suggested that compensation provisions which would protect a person serving under the sheriff pursuant to the above authority would have application in this case. At any rate, no emergency existed nor have we been provided with any authority to the effect that Mr. Hedman in his capacity as sheriff of Ramsey County could enlist the aid of civil defense workers throughout the county in service on a municipal traffic problem.

It is clear that the petitioner was present in the parade area as a civil defense volunteer pursuant to the call of Mr. Hedman in his capacity as director of Ramsey County Civil Defense. The call was addressed to various civil defense groups in the county pursuant to authority granted by § 12.25, subds. 1 and 2.[3] That statutory authority (subd. 2) gives to the county civil defense organization jurisdiction throughout the county, but limited to those subdivisions of government which do not have a civil defense organization. Since the village of

---

[3]Section 12.25, subds. 1 and 2, provide: "Subdivision 1. Each political subdivision of this state is hereby authorized and directed to establish a local organization for civil defense in accordance with the state civil defense plan and program, but no town shall establish a local organization for civil defense without approval of the state director. Each local organization for civil defense shall have a director who shall be appointed forthwith in a city, village or borough by the mayor thereof and in a town by the town board who shall have direct responsibility for the organization, administration and operation of such local organization for civil defense, subject to the direction and control of such governing body.

"Subd. 2. Each county civil defense organization shall have a director and one or more deputy directors. They shall be appointed by the county board. A county organization for civil defense shall have jurisdiction throughout the county outside of any city, village or borough, or of a town which has a local civil defense organization. In addition to the other powers granted by this subdivision, such county organizations are authorized and directed to coordinate the activities of and may assist in the training of civil defense organizations of political subdivisions within the county, plan for the continuity of county government in cooperation with the county attorney who is authorized and directed to give legal advice to the county organization, acquire equipment necessary in connection therewith, and expend funds provided by the county board out of general revenue funds for such purposes."

Arden Hills had a civil defense organization, the functions of that unit were not within the control or jurisdiction of the county unit. Under subd. 2 the county civil defense organization did have jurisdiction, however, over all units within the county for the purpose of coordinating their activities and assisting in their training. Pursuant to this authority the sheriff as director of the county unit had previously conducted a training course consisting of 10 subjects.[4] We do not understand that the completion of this training course made it unnecessary for the volunteer members to continue training and practice in the duties civil defense work would require them to perform. Sheriff Hedman testified:

"* * * We have about 10 or 12 County civil defense units which have auxiliary police units that we train. In the bulletin we ask them if they want to come in and assist us in the operation of this parade as part of their training program. As Ramsey County civil defense director I have no authority to order them in. But I can ask them to volunteer to come which I do."

The civil defense program must be considered a recognized governmental function, and responsibility for the training of civil defense personnel is a matter of concern not only to the particular municipal unit of which the volunteer may be a member but to the citizens of the entire state and nation. It is this aspect of the employment which distinguishes it from a private or industrial employment relationship to which the loaned-servant principle might apply. The petitioner has status as an employee only by reason of § 176.011, subd. 9. The authority of the county civil defense director is limited by § 12.25, subd. 2, to coordinating activities and assisting in the training of the employee. The exercise of this authority did not effect a change of employers. The fact that the municipality wherein the volunteer may be

---

[4]These subjects included Civil Defense and Related Police Work — CD Film; Traffic Control and Police Problems — Film, Traffic Con.; General Police Duties and Law of Arrest; Gun Safety and the Handling of Fire Arms; Police Problems and Evidence; Communications, Sheriff's Radio — Ham Operators; Rescue and First Aid I; Rescue and First Aid II; Radiological Service; Ramsey County Survival Plan (Civil Defense).

serving at the time of his injury may benefit from his service does not alter the purpose for which he was called to serve. We do not think it would be fair to say that when the petitioner came to St. Paul on the day in question his employment with the village of Arden Hills ceased and a new employment relationship was created, either with the city of St. Paul or the county of Ramsey. While he was serving in the city of St. Paul he was learning and gaining experience to prepare himself for the performance of important civil defense functions. We agree with the Industrial Commission that to hold otherwise would be to create unreasonable burdens. It appears from the record that it is not unusual for volunteers from various governmental areas to gather for training at a central point. To say that the place of the accident determines responsibility would be to expose the municipality which provides training facilities to an unreasonable burden. We doubt if the legislature intended such a result. Where, as here, the words of a law are not explicit, the intention of the legislature may be ascertained by considering the object sought to be attained and the consequences of a particular interpretation. §§ 645.16, 645.17; Erickson v. Sunset Memorial Park Assn. Inc. 259 Minn. 532, 108 N. W. (2d) 434; Wichelman v. Messner, 250 Minn. 88, 83 N. W. (2d) 800, 71 A. L. R. (2d) 816.

The stipulation of the parties to the effect that at the time the petitioner was injured he was an employee within the meaning of § 176.011, subd. 9, must control our decision. As such an employee, he was a volunteer in training at the time the accident occurred. He as well as other volunteers who reported for duty did not change employers but continued the relationship of employer and employee with the municipalities to which they were attached.

Affirmed.

OTIS, JUSTICE (dissenting).

I dissent. Mr. Besch was not an employee of any of the parties to this litigation when he was injured. It is only because they have stipulated that he is entitled to compensation under Minn. St. 176.011, subd. 9, that the matter is before us. That statute provides in part as follows:

"Voluntary uncompensated workers engaged in peace time in the civil defense program *when ordered to training or other duty* by the state or any political subdivision thereof, shall be employees." (Italics supplied.)

When struck by an automobile at University Avenue and Robert Street, Mr. Besch was not acting under any civil defense *orders,* but was purely and simply a volunteer performing the functions of a traffic policeman for the city of St. Paul. The obvious reason his assistance was requested was that he had a uniform, had some previous experience, and was conveniently available through his civil defense connections.

There is no claim that Mr. Besch was performing any "duty" other than directing traffic which was unrelated to civil defense. That it is the city's responsibility to handle traffic within the municipality can hardly be questioned. Lt. Theodore Donald Wallace of the St. Paul Police Department testified upon cross-examination under the statute that under usual and ordinary circumstances this is the duty of the St. Paul police within the entire city. He conceded that if it were not for civil defense personnel, the city would either have to put on additional officers or find help from other sources in handling parades such as that of the 40 and 8. Mr. Kermit Hedman, who was in charge of the activities, testified that he was not acting as sheriff of Ramsey County when directing parades, and said that although his office had the power to control highways within the city limits it was not exercised except in extreme situations, since this was the responsibility of the St. Paul city police.

At the time of the accident Mr. Besch was not performing any service for the village of Arden Hills, and it had no authority, direction, or control over him. This was not a part of any civil defense program. While the bulletin which went out to local civil defense officials refers to "POLICE DUTY FOR PARADES," it is couched in terms of a request and not an order and makes no mention of training. Mr. Fish, who accompanied Mr. Besch, testified that they reported on a voluntary basis, were under no obligation to attend the parade, had no supervision from any unit leaders, and training was not discussed.

Even the director of the Ramsey County Civil Defense conceded that the assignment was voluntary, although he felt it had some value as training. Mr. Besch himself stated that he was under no orders from anyone connected with the Arden Hills Civil Defense program while directing traffic and that he had previously completed all of his formal training in traffic control as a part of his civil defense indoctrination course.

The director of the Arden Hills Civil Defense group expressly denied that the purpose of calling for volunteers was to furnish training in traffic control for those who needed it. It is clear that in any view of the matter at most Mr. Besch could be expected only to experience *practice* in traffic control. "Training" requires an element of teaching or instruction which was completely absent according to all the testimony.

To hold that Mr. Besch was an employee of the village of Arden Hills under orders to receive training as a part of a civil defense program may be what the Industrial Commission calls a "pragmatic solution," but it finds no support in the record. The evidence completely negates the assumption that § 176.011 is applicable. We are not obliged to permit litigants by stipulation to torture the law and the facts in justification of an award which is not authorized by the statute simply because the objective is a worthy one.

Mr. Besch has been seriously hurt while performing a valuable and laudable service for the city of St. Paul. It is to be hoped that some lawful way may be found to compensate him for his injuries. But to condone an application of the statute which is manifestly contrary to its purpose, merely because the parties recognize a moral obligation to compensate respondent out of public funds, is to accept a responsibility we are not required to assume.

I would dismiss the proceedings.