SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-14-54

| | | |
|---|---|---|
| WILLIAM L. DURHAM | | **Opinion Delivered** September 24, 2014 |
| | APPELLANT | |
| | | |
| V. | | APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION [NO. G011082] |
| PRIME INDUSTRIAL RECRUITERS, INC.; ELITE WORKFORCE MANAGEMENT; AND WELSPUN PIPES, INC. | | |
| | APPELLEES | |
| | | AFFIRMED |

### DAVID M. GLOVER, Judge

In this workers' compensation case, the Commission affirmed and adopted the ALJ's decision, which concluded that William Durham was jointly employed by both Elite Workforce (Elite) and Welspun Pipes (Welspun). Application of the dual-employment doctrine protects Welspun from tort liability under the exclusive-remedy provisions of the Workers' Compensation Act. In this appeal, Durham contends that 1) the Commission's finding that an implied contract of hire existed between him and Welspun was based upon circular logic, 2) the Commission arbitrarily disregarded all of the documentary evidence obtained from Welspun regarding the relationship of the parties, and 3) the dissimilar treatment of Elite employees, as opposed to Welspun employees, refuted the implication of an implied contract between him and Welspun. We affirm the Commission.



*Standard of Review*

In reviewing Commission decisions, we examine the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings and affirm if the decision is supported by substantial evidence. *Beaver v. Graphic Packaging*, 2011 Ark. App. 524. Substantial evidence exists only if reasonable minds could have reached the same conclusion without resorting to speculation or conjecture. *Id.* Although we give deference to the Commission on issues of weight of evidence and credibility of witnesses, the Commission may not arbitrarily disregard testimony and is not so insulated that it renders appellate review meaningless. *Id.* We will not reverse the Commission's decision unless we are convinced that fair-minded persons with the same facts before them could not have reached the Commission's conclusions. *Id.*

*Applicability of Dual-Employment Doctrine*

In *National Union Fire Insurance v. Tri-State Iron & Metal*, 323 Ark. 258, 261, 914 S.W.2d 301, 302 (1996), our supreme court described the dual-employment doctrine:

> When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if
>
> (a) The employee has made a contract for hire, express or implied, with the special employer;
>
> (b) The work being done is essentially that of the special employer; and
>
> (c) The special employer has the right to control the details of the work.

The solution of almost every such case depends upon the answer to the basic, fundamental, and bedrock question of whether, as to the special employee, the relationship of employer and


employee existed at the time of the injury. *Daniels v. Riley's Health & Fitness Ctrs.*, 310 Ark. 756, 840 S.W.2d 177 (1992) (citing *Charles v. Lincoln Constr'. Co.*, 235 Ark. 470, 361 S.W.2d 1 (1962); *Stuyvesant Corp. v. Waterhouse*, 74 So. 2d 554 (Fla. 1954)). If the facts show such a relationship, the existence of a general employer should not change or be allowed to confuse the solution of the problem. *Id.* Because both employers may each have some control there is nothing logically inconsistent, when using this test, in finding that a given worker is the servant of one employer for certain acts and the servant of another for other acts. *Id.* (citing *Nepstad v. Lambert*, 50 N.W.2d 614 (Minn. 1951)). The crucial question is which employer had the right to control the particular act giving rise to the injury. *Id.* Because the question of liability is always raised in relation to some specific act done, the important question is not whether the employee remains the servant of the general employer as to matters generally but whether, as to the act in question, he is acting in the business of and under the direction of one or the other. *Id.*

*Background*

Three persons testified at the hearing before the ALJ: William Durham, claimant; Chris Rawlings, owner of Elite; and Martin Cain, health, safety, and environment director for Welspun. Their detailed testimony follows.

William Durham testified that when he was looking for a job in 2010, he completed an application for employment at Elite; that he completed it at the Elite office, which is located on the Welspun property in a separate building; that he did not talk to anyone from Welspun when he filled out the application at Elite; and that he interviewed at the Elite office

but did not interview with anyone from Welspun. He stated that he was eventually hired by Elite, and they told him he would be working at Welspun. He said he worked as a quality-control inspector in the inspection department at Welspun.

Durham explained that he started his job at the Welspun plant and that he was trained for a week or two by an Elite employee, who was also a temporary employee working at Welspun, to work the computers. He said that Elite provided the hard hats, ear plugs, goggles, and eye protection when he went to work at Welspun; that there were differences between the Elite and Welspun safety equipment worn by employees; that the Elite hard hats were orange and the Welspun hats were blue; that the ID badges were different; and that his ID badge indicated he was an Elite employee. He explained that he was paid by Elite every week, but Welspun employees were paid every two weeks, and that if he had a problem with his paycheck he would go to the Elite facility. He stated that he did not always get a lunch break when he worked at Welspun; that Welspun employees did get lunch breaks; and that Elite employees were not allowed to go to Welspun employee events.

Durham explained that Saleem Sawar was his supervisor and that Sawar was a Welspun employee. He said that Sawar called him into the office one morning and told him that if he did not miss any days from November until January, Sawar would hire him as a Welspun employee. He stated that it was his perception that he would have a better job and more pay as a Welspun employee. He said that in order to be hired by Welspun, he would have to go through the Welspun office, which was separate from the Elite office.

Durham testified that on December 21, 2010, he reported to work at 7:00 p.m. and went to see Sawar to find out which station he was to work. He said that during his inspection of the pipes, a pipe came in behind him and "smashed" him. He stated that one of his co-workers, a panel operator, tried to hit the "e-stop" button and reverse the rollers; that nothing worked and the co-worker came down to try to help him; that he fell to the ground trying to reach up and grab the co-worker, but the pipes came back and "grabbed" the co-worker by the head; and that there was nothing he could do about it. Durham explained that he was taken to the hospital after the accident and that while he was there, he received a letter from Elite stating that Elite employees needed to come in and sign a waiver.

On cross-examination, Durham testified that Elite supplied him to Welspun as a temporary employee, and that he understood if he was hired by Elite he would be working at the Welspun plant. In discussing a document that he filled out during orientation conducted by Welspun, he explained that he put his name after the word, "employee"; that Welspun was written at the top of the document; that he received a document that provided, "I have received the orientation from the Welspun safety team according to all safety aspects here at Welspun"; and that his name was printed on the document and he signed and dated it at the bottom. He said that the training was basically about hard hats, goggles, ear plugs, and boots; and that they were not shown any particular way to be safe in a plant. He stated that on the day he was hired, he was given a tour of the Welspun plant and learned about the different areas; that he met his Welspun supervisor, Saleem Sawar; and that Sawar told him he would be working in quality control in Welspun's coating plant.

SLIP OPINION

Durham testified that Elite supplied him with his identification card and that his card got him into the same places as the Welspun identification cards.

Durham stated that the Elite employee who trained him also taught him how to inspect pipes and make sure the coatings did not have bubbles; that at some point he worked at the outbound station in the coating plant; that he was trained by Elite and Welspun employees; and that the Elite employees were temporary employees from Elite who were working at the Welspun plant. He identified attendance sheets from Welspun training sessions that included "Codification in Final Table Inspection, Fire Extinguisher/Fire Safety, Master Paints, Hearing Protection, Mobile Equipment Inspection, and KXL Inspections."

He stated that Welspun decided his rotation, his hours, and which holidays he would work. He explained that, aside from the helmets, goggles, and his first set of ear plugs, all of the other equipment he used came from Welspun. He acknowledged that he understood Welspun could fire him; that every day he went to work, he clocked in at the Welspun plant and reported to Sawar; that Sawar would tell him what to do that day; that the only reason he would return to the Elite office was if there was a problem with his check; that no one at the Elite office ever told him what to do in the Welspun plant; and that there were no Elite supervisors in the Welspun plant.

In response to the question whether he considered himself a Welspun employee, Durham acknowledged that, in a way, he did consider himself a Welspun employee, but in a way, he did not. He acknowledged that he had testified in his deposition that he considered himself a Welspun employee because he worked there inside the plant; that Welspun basically

told him what to do at work; and that his supervisor, Sawar, told him that if he could improve his attendance, he would probably be hired at Welspun.

Durham acknowledged that he was injured during the course of his work and received medical treatment; that all of his medical bills had been paid; that he understood that Elite supplied people to the Welspun plant only; that the only supervisors he had worked for were Welspun supervisors; and that the only people who assigned duties were Welspun supervisors. He stated that if the Welspun plant were not there, he would not have any employment through Elite.

Chris Rawlings, who is the owner of Elite, testified that he was responsible for business functions, financial responsibilities, sales, marketing, and staff management. He stated that he was familiar with Welspun's relationship with Elite; that Elite's primary function was to "onboard employees and recruit"; and that once the employees were on site, Welspun dictated work direction, shift hours, pay rates, and everything else. He stated that Elite employees hired in Little Rock worked only at the Welspun plant and that Elite had had an exclusive-market contract with Welspun since roughly August 2010. He stated that Elite's office was located at the Welspun facility, and he identified a copy of the contract for services between Welspun and Elite as it existed in 2010. He identified his signature on the document and stated that once employees were in the facility, payroll was Elite's primary function. He stated that Welspun managed the training, management, timekeeping, supervision, direction of work, setting of shifts and hours, and provision of hard hats and goggles after the first ones were issued. He said that Welspun disciplined and fired employees provided by Elite; that if

SLIP OPINION

such an employee were fired, there was no place else to go through Elite; that Elite employees worked exclusively for Welspun; that Welspun had the right to control their work; and that Elite did not have any supervision in the Welspun plant.

Rawlings testified that he was familiar with Durham and that Durham was one of the Elite temporary employees who was assigned to Welspun; that once Durham was sent to the Welspun plant, Elite could go into the Welspun timekeeping system and get the time that he logged in and out; and that Elite would then process payroll based on those hours. He explained that Durham was paid weekly; that the pass-through to Welspun was based on work hours performed per employee; that Elite created a weekly invoice and submitted it with the backup timekeeping data; that Welspun would turn over Durham's hours and pay Elite for the time that Elite was paying Durham; and that Welspun determined Durham's pay rate.

On cross-examination, Rawlings further explained that Elite was an onsite staff-management business, and that it did not function as a professional-employer organization, which has to be registered with the State. He stated that in Elite's agreement with Welspun, his company was referred to as the contractor, and that a paragraph of the agreement titled, "Contractor's Negligence," provided that if an Elite employee was negligent and caused damage, then Elite would indemnify and hold Welspun harmless for any damages caused. He explained that after the incident involving Durham, Elite was given some direction by Welspun to have the Elite employees come into the office and sign a waiver form. He could not recall who specifically told him to do that, but he said it would have been someone in

Welspun's upper management. He stated that the waiver agreement existed before the incident; that it existed between the employee and Welspun, not between the employee and Elite; that Welspun asked Elite to make sure that everybody had signed one; and that Elite did not sign any part of it. He acknowledged sending out the January 7, 2011 letter following the work incident and at the direction of Welspun.

On redirect examination, Rawlings stated that he was not aware of whether Durham signed the agreement; that the person who signs the agreement is referred to as an assigned employee under the agreement; and that the January 7, 2011 letter did not change anything about the relationship between Elite and Welspun.

Martin Cain, who is the health, safety, and environment director for Welspun, testified that he worked directly for the president of Welspun and that he was familiar with Welspun's relationship with Elite. He explained that Elite interviewed, screened, and sent employees to Welspun; that Welspun was committed to its regular employees to try to maintain level employment for them; and that if there were a decrease in sales, the Elite people would be the first ones laid off.

He testified that Welspun hired management employees directly; that it also hired for positions that required special qualifications, such as an equipment operator, maintenance machinist, or millwright; and that, generally, Elite provided the other employees. He stated that Welspun and Elite had a contract for their service, and once Elite supplied a temporary employee, Welspun trained him at safety orientation and assigned him to a job in the plant and trained him regarding what job he should do, work instructions, and job-safety analysis.

9

He explained that Welspun supervised the employees' work and decided what job they would perform, and that Welspun provided any needed replacement equipment and special personal-protection equipment.

Cain also testified that Welspun set the shifts and work hours; that Elite temporary employees and full-time Welspun employees were given the same breaks and had the same break room; that Welspun could discipline and terminate the employees; that all of the work done by employees supplied by Elite was for Welspun; that Welspun had the right to control their work; that Elite did not provide onsite training; and that Elite did not supervise them in the Welspun plant.

Cain stated that he was familiar with Durham and the fact that he was injured at the plant; that Durham was a temporary employee hired by Elite and working at Welspun; that he was a quality inspector for Welspun, supervised by Saleem Sawar, who was a full-time employee of Welspun; that Sawar could tell Durham where to work every day and which job to perform every day; that he could determine which equipment Durham would use and would make sure he was trained; and that Sawar would determine Durham's shift and the days and hours Durham worked.

He explained that Durham was paid based on an hourly rate; that Welspun provided the hours to Elite for him to get paid; that Welspun kept track of Durham's hours at the plant; that it was done on the same system as full-time Welspun employees; and that no differentiation was made on the time system.

He testified that on December 21, 2010, which was the date Durham was injured, Durham came to work at the Welspun plant; that he was being supervised by Welspun; that no Elite supervisors were present and none came to the scene after the accident; that Durham was treated the same as a full-time Welspun employee; and that his actions were controlled by Welspun.

*Discussion*

All of Durham's points challenge in some way the Commission's conclusion that he was jointly employed by both Elite and Welspun at the time of his injury. He does not dispute the existence of two of the three elements necessary to establish dual-employment, i.e., he does not dispute Welspun's right of control or that he was performing Welspun work at the time of his injury. He does, however, dispute the existence of an implied contract of hire.

1. *Implied Contract*

Durham contends that the Commission's finding that an implied contract existed between him and Welspun was based on circular logic because Welspun expressly disavowed the existence of such a contract prior to the instant litigation, the ALJ pointed to no evidence of the existence of such a contract in his decision and did not discuss the waiver, and Saleem Sawar had offered him at job at Welspun if he improved his attendance. We do not agree that the Commission employed circular logic in finding an implied contract.

The ALJ's decision was affirmed and adopted by the Commission. The ALJ specifically found that an implied contract of hire existed between Durham and Welspun. The ALJ's

decision notes that Durham testified at the full hearing that he understood that if he was hired by Elite that he would be working in the Welspun plant because Elite supplied employees to Welspun only. In addition, the ALJ noted that in finding an implied contract of hire, he was not disregarding the fact that Elite actually paid the claimant's wages and provided the claimant with some safety equipment at the time of hire. He explained that whether the special employer pays the general employer who in turn pays the employee, or whether the special employer pays the employee directly, the difference was one of mechanics and not substance.

Our review of the evidence before the Commission supports the finding of an implied contract of hire. Durham acknowledged that he knew when he was hired by Elite that he would be working for Welspun, that he considered himself an employee of both, and that he attended Welspun's orientation and training meetings. Durham's wages were the ultimate responsibility of Welspun, even though he received his paycheck from Elite, because Welspun paid Elite for Durham's work based on the hours he worked, plus payment to Elite for its services in providing temporary personnel.

Our review must focus on whether the Commission's decision displays a substantial basis for its decision, *i.e.*, could fair-minded persons with the same facts before them have reached the same conclusion. *Beaver, supra*. It is within the Commission's province to reconcile conflicting evidence, and to determine the true facts. *Raulston v. Waste Mgmt., Inc.*, 2012 Ark. App. 272, 411 S.W.3d 711. The Commission's failure to specifically discuss conflicting evidence does not mean that it was arbitrarily disregarded where there is substantial

evidence to support its decision. *Id*. There was substantial evidence to support the Commission's finding of an implied contract for hire between Durham and Welspun.

### 2. *Documents*

Durham next contends that the only way the Commission could have reached its decision was to arbitrarily disregard all of the documentary evidence obtained from Welspun regarding the relationship among the parties, along with the testimony of Chris Rawlings. In particular, he relies on the "Confidentiality and Waiver Agreement," the January 7, 2011 letter that was sent to Elite employees following Durham's injury, the "Staffing Services Agreement," and the "Agreed Schedule of Contracted Rates." He further contends under this point that the Commission's decision violates "the doctrine against inconsistent positions," warranting reversal of the decision. We disagree.

The fact that these documents refer to Elite employees and designate Elite as the contractor does not preclude those same employees from also being employees of Welspun, which is what the Commission concluded. Moreover, it can be fairly said that these documents support the Commission's decision. For example, the "Confidentiality and Waiver Agreement" is attached as Exhibit A to the Staffing Services Agreement, which provides in part:

> 7.4 *Dual Employment*—For purposes of determining responsibility for indemnification under Sections 7.2 and 7.3 above [Contractor's and Company's negligence], Contractor [Elite] shall be solely responsible for the negligence, gross negligence or willful misconduct of any employee Contractor [Elite] provides under this Agreement *including any employee treated for purposes of Arkansas law as an employee of Contractor [Elite] and Company [Welspun].*

13

SLIP OPINION

(Emphasis added.)  Similarly, nothing in the "Agreed Schedule of Contracted Rates" or the January 7, 2011 letter to "Elite Employees" undermines the Commission's decision that Durham was jointly employed by both Elite and Welspun.

As mentioned previously, the Commission's failure to specifically discuss conflicting evidence does not support the position that it arbitrarily disregarded that evidence if there is substantial evidence to support its decision that Welspun and Elite were joint employers. *Raulston, supra.*  Here, the Commission determined that Durham was employed by both Elite and Welspun.  The documents relied on by Durham do not demonstrate such inconsistent positions that fair-minded persons could not consider them as part of the overall evidence and reach the same result as the Commission that Durham was jointly employed by both Elite and Welspun.

As our supreme court explained in *Edgin v. Entergy Operations, Inc.*, 331 Ark. 162, 169, 961 S.W.2d 724, 727 (1998):

> Furthermore, our interpretation of this agreement is not inconsistent with the sound public policy considerations that form the basis of our workers' compensation laws.  Nor is it inconsistent with this court's previous holdings in *Daniels v. Riley's Health & Fitness Ctrs.*, 310 Ark. 756, 840 S.W.2d 177 (1992), and *National Union Fire Ins. v. Tri-State Iron & Metal*, 323 Ark. 258, 914 S.W.2d 301 (1996), which involved the application of the dual-employment doctrine.  In both of those cases, this court held that the workers, who were employed by temporary employment agencies and were injured while working their assigned jobs for a special employer, were not entitled to bring suit against those special employers, as such claims were barred by the exclusive-remedy provision of our Workers' Compensation Act.

14

Our review convinces us that there was substantial evidence to support the Commission's decision, and the existence of the documents relied on by Durham do not support reversal of that decision.

### 3. *Dissimilar Treatment*

For his final argument, Durham contends that the dissimilar treatment of Elite employees, as opposed to Welspun employees, refutes the implication of an implied contract between him and Welspun. He lists examples, such as Elite employees wore different-colored hard hats and identification badges, Elite employees used a separate human-resources office, Elite employees were paid weekly while Welspun employees were paid every two weeks, and Welspun events did not include Elite employees. The argument is simply not convincing and demonstrates a misunderstanding of the concept of dual employment. We have earlier held in this opinion that the Commission's finding that an implied contract existed between Durham and Welspun was supported by substantial evidence. Durham's argument here does not convince us otherwise.

Affirmed.

HARRISON and WYNNE, JJ., agree.

*M. Keith Wren*, for appellant.

*Friday, Eldredge & Clark, LLP*, by: *James M. Simpson*, *Guy Alton Wade*, and *Phillip M. Brick, Jr.*, for appellees.