Cite as 2025 Ark. App. 304

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-24-319

| | |
|---|---|
| EMERY HUMPHRIES<br><br>APPELLANT<br><br>V.<br><br>FNA GROUP, LLC; AND AMTRUST NORTH AMERICA<br><br>APPELLEES | Opinion Delivered May 14, 2025<br><br>APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION<br>[NO. G905793]<br><br>REVERSED AND REMANDED |

**CINDY GRACE THYER, Judge**

Emery Humphries appeals from an order of the Arkansas Workers' Compensation Commission ("the Commission") that determined he was jointly employed by appellees FNA Group, LLC ("FNA"); and Labor Solutions, LLC, and was thus foreclosed from pursuing a tort claim against FNA following a work-related injury. We reverse and remand.

## I. *Factual and Procedural Background*

In July 2019, Humphries was hired by a temporary staffing agency, Labor Solutions, which assigned Humphries to work with one of its customers, FNA.[1] Relevant to the issues raised in this appeal, the contract between Labor Solutions and FNA (identified in the

---

[1]FNA is a manufacturer of pressure washers and outdoor power equipment with a facility located in Decatur.

contract as the "Customer") contains the following provision regarding the status of personnel hired by Labor Solutions:

> Labor Solutions, at its cost, shall provide personnel (the "Personnel") to perform the Services. Labor Solutions shall be solely responsible for the full payment of all compensation due the Personnel, including, without limitation, all wages, benefits, withholdings, payroll taxes and contributions. *No Personnel of Labor Solutions shall be deemed an employee of Customer for any purpose relating to this Agreement*, including, without limitation, under any compensation or benefit plan of Customer.

(Emphasis added.)

In August 2019, Humphries sustained a partial leg amputation in an accident involving a box-baling machine. He filed suit against FNA and others in the Circuit Court of Benton County.[2] After FNA moved to dismiss the complaint, the circuit court stayed the case as to Humphries's claims against FNA so that the parties could litigate the issue of Humphries's employment status in a proceeding before the Commission.

In May 2023, an administrative law judge (ALJ) held a hearing to determine whether Humphries was a dual employee of both Labor Solutions and FNA at the time of Humphries's injury such that both would be protected under the exclusive-remedy provisions of the Workers' Compensation Act. Humphries testified that he was hired by Juan Dominguez at Labor Solutions in July 2019. He said Dominguez went over the safety and health rules with him and issued him a Labor Solutions shirt, which he wore to work every

---

[2]Humphries's circuit court suit also named the manufacturer of the baling machine and the recycling company that leased the baler to FNA as well as multiple John Doe defendants. Humphries also pursued a workers'-compensation claim against Labor Solutions, which was settled and approved by the Commission.

day. Labor Solutions provided him with personal protective equipment (PPE). Humphries said that he worked on the line with other Labor Solutions employees, and the person who directed him to work on the box baler on the day of his injury wore a Labor Solutions shirt. Humphries testified that Labor Solutions controlled where he was working and provided all instruction and training. FNA did not provide him with any instructions, training, or PPE.

Humphries's W-4 listed Labor Solutions as his employer. A document titled "Labor Solutions of Arkansas, LLC--Mini Facts" outlined a set of policies and procedures and was signed by Humphries and Dominguez. The Mini Facts document established the pay rate, rules of conduct, activities that could result in termination, attendance policies, and other similar policies. Citing that document, Humphries testified that if he was sick or hurt, or was going to miss work, he was supposed to call Labor Solutions. Humphries clocked in and out of work using a Labor Solutions employment number. Humphries testified that Labor Solutions set his pay, withheld taxes from his paycheck, set his hours, and performed his orientation.

Humphries said he never signed any kind of contract or agreement with FNA, did not have any kind of verbal agreement to work with FNA, and never had the desire or intent to ever work for FNA. After Humphries's injury, the CEO of Labor Solutions came to the hospital to get information from him about the accident, but no one from FNA spoke to him.

Regarding his injury, Humphries testified that a Hispanic man wearing a Labor Solutions shirt had assigned him to work at the box baler a few days before the injury. Kevin,

3

another employee wearing a Labor Solutions shirt, worked alongside Humphries on the baler. No one from FNA told him how to load boxes into the baler; all of his training was from Kevin. Kevin, who did not speak English, trained Humphries by showing him what to do. No one gave Humphries an operator's manual or written instructions on how to run the baler, and no one taught him how to turn it on and off. Humphries said the baler would clog from time to time, and Kevin "jumped inside of it and jumped on the boxes" to unclog it. He then described his injury, saying that when the baler got stuck, he got into the machine and started jumping, but nothing happened.

> So at that point I proceeded to walk to the back wall and I kicked it in and as soon as I kicked it in, my leg got stuck in between the wall and the cardboard pallet. And at that point the machine kicked back on and I started screaming for help and the cardboard pallet just got tangled with my ankle. There was nothing that I could do. I started screaming for help and no one came. So I prayed to God to give me strength to get out of it, so I ripped my leg out and I hopped out. And I had to hop to find someone to help me.

Someone from Labor Solutions found him and helped him back to the Labor Solutions office.

After Humphries rested his case, FNA's first witness was Rick Hickson, the FNA warehouse manager at the time of Humphries's injury. Hickson said that FNA obtained its workers through temporary agencies. He described the facility, noting that there was a sign outside the entrance used by all employees that said "FNA Employee and Visitor Entrance." He said there were several signs around the workplace with the name FNA on them.

Hickson testified that Labor Solutions had an office on site with its own entrance at the FNA facility. He said that when he needed workers in a given department, he would

4

either go through FNA's human-resources department or call Dominguez and request a given number of people for the assembly line or warehouse; Labor Solutions would then recruit people and bring them in. Hickson testified that FNA set the time to report to work every day, set the times for breaks, set the pay rate, and determined who line leaders would be. Labor Solutions had no input in determining who would work on a particular line or who would be assigned to a given job. Hickson said that FNA retained the right to terminate someone from Labor Solutions working in the plant; he said FNA would "just tell temp agencies we did not need that person there anymore." He asserted that FNA was "ultimately responsible" for determining whether work was being done up to its standards and that FNA controlled the means and method of work and how the job was done.

Regarding Humphries, Hickson said that Labor Solutions had nothing to do with assigning him to work on the baler. As part of the OSHA investigation of the incident, Hickson filled out a form that stated he had the authority to hire and fire Labor Solutions' employees. The form also stated that an FNA supervisor directed the employees' day-to-day work for Labor Solutions. Hickson agreed that Labor Solutions would hire workers, do the orientation, and provide workers'-compensation coverage, but as far as managing the work, "that was done by FNA." FNA maintained control over the quality of the work and the manner in which it was done. He said FNA needed to maintain control over the work because it involves "building a product for our customer and we have to have control over who is doing what. It would be pretty chaotic if we would just bring people in and turn them loose in the building."

On cross-examination, Hickson agreed that the Mini Facts document was a "Labor Solutions document" and that FNA had nothing to do with creating it. Hickson said he had nothing to do with human resources; he did not keep track of employment or personnel files. He also conceded that the Mini Facts document gave Labor Solutions, not FNA, the right to hire and fire personnel. Hickson acknowledged that Labor Solutions had its own supervisors who would document attendance and check PPE and other safety measures.

Hickson said he had no personal knowledge of who asked Humphries to work on the baler the day he was injured, who Humphries was working with that day, or who trained him. Hickson was uncertain what job Humphries performed on the assembly line, and he had no interaction with, training of, or control over Humphries. At the time of Humphries's injury, FNA had no personnel file on him and did not even have his phone number. It was Hickson's understanding that a Labor Solutions employee trained Humphries on the baler; he agreed that no one from FNA trained Humphries to operate the baler.

Juan Dominguez worked for Labor Solutions at the time of the incident. He explained that FNA would send Labor Solutions the number of openings it had for a given day or week, and Labor Solutions would recruit people for the job. He did not recall interviewing Humphries but said he would generally go over the necessary paperwork with employees. As to the Mini Facts document, Dominguez said that FNA set the time for people to report to work, set the pay rate, scheduled the breaks, and determined job assignments and overtime. He said Humphries would have known that he was working for FNA. On cross-examination, however, he acknowledged that the tax forms, paychecks, safety policies, and Mini Facts

6

document all came from Labor Solutions, so he could "see where [an employee] might think [he is] working for Labor Solutions."

Tom Moffett, the FNA senior vice president, testified that part of his job involved dealing with Labor Solutions. He explained that manufacturing power washers is a seasonal job, so the company does not need the same number of people in its factories at all times. Given the seasonal nature of FNA's payroll needs, it was cheaper for the company to pay an outside resource, like a temp agency, to handle payroll, taxes, and workers' compensation. FNA paid Labor Solutions a 25 percent markup over employee wages to cover administration fees, recruiting fees, payroll taxes, and workers' compensation. Wages, however, were set by FNA. FNA, he said, "assumes control of the employee and designates the assignment and is responsible for the daily oversight, training, management, and productivity of that individual associate." Labor Solutions would "do the orientation and get the people in the door," and FNA "move[d] the employees and control[led] the job."

On cross-examination, Moffett agreed that FNA had not paid any benefits directly to Humphries. He likewise agreed that he was unaware of any training that FNA ever provided to Humphries and could not name any person at FNA who moved Humphries from one position to another. He conceded that FNA had no records showing that FNA managed or assessed the performance of any Labor Solutions individual employee. Moffett then shared this exchange with Humphries's counsel:

> Q: I asked you some questions [in your deposition] and I don't think you knew the answer, but if [Humphries] were to say, hey, I am an employee of FNA and

I want to make a sexual harassment claim against FNA, would you guys accept him as your employee?

A:  We would accept and investigate the allegations, but we would do it jointly with Labor Solutions.

Q:  You would reserve your right to allege he is not our employee, he is an independent contractor, right?

A:  We would not necessarily technically say that. We would just say, hey, look, there is an allegation and our two HR departments for both companies would interact. I don't think we would ever think for a moment that we're making a declaration in terms of their employment status, but rather investigate the claim.

Q:  Other than the declaration you made in the contract of what the employment status is?

A:  That is fair, yes.

Q:  Okay. And I could ask you about the whole slew of things: Alleged discrimination, FMLA violations, EEOC, ADA, ERISA, all of those, you would reserve your right to say *he can't make that claim against us because he is not our employee, correct?*

A:  *That is correct.*

Q:  *Based on the contract you signed?*

A:  *Yes, sir.*

(Emphasis added.)

After considering posttrial briefs, the ALJ issued an opinion finding that Humphries was not a "dual employee" of Labor Solutions and FNA. FNA timely appealed the ALJ's decision to the full Commission. In a 2–1 decision, the Commission reversed the ALJ, reasoning that "our courts have consistently held that staffing agencies and temporary

agencies such as Labor Solutions are part of today's marketplace and staffing agency-contractor relationships satisfy the dual-employee doctrine." The Commission concluded there was no express agreement between FNA and Humphries. It then considered whether there was an implied agreement, which it said could be proved "by showing the parties intended to contract by circumstances showing the general course of dealing between the parties. The primary test is which party controls the work being done." The Commission concluded that "FNA had total control over all aspects of the work done in their facility, including the quality of the work and how the work was performed. Labor Solutions had no control or supervision over the line work or how FNA products were made." Accordingly, the Commission found that FNA was a dual employer of Humphries at the time of his injury.

The Commission discounted the language in the contract between FNA and Labor Solutions, finding that because Labor Solutions "had no say in any essential aspect of Humphries's work with FNA, the parties were operating under an implied contract at the time of the claimant's injury." Therefore, because FNA was a special employer of Humphries at the time of his injury, FNA was entitled to the protection of the exclusive-remedy doctrine. Humphries filed a timely notice of appeal and now argues to this court that the Commission erred in finding that an implied contract existed between him and FNA.

## II. *Standard of Review*

In workers'-compensation appeals, this court reviews the evidence and all inferences in the light most favorable to the Commission's findings and affirms if the decision is supported by substantial evidence. *Randolph v. Staffmark*, 2015 Ark. App. 135, at 1, 456

S.W.3d 389, 390–91. Substantial evidence exists only if reasonable minds could have reached the same conclusion without resort to speculation or conjecture. *Id.* at 1–2, 456 S.W.3d at 391. We will not reverse the Commission's decision unless we are convinced that fair-minded persons with the same facts before them could not have reached the Commission's conclusions. *Id.* at 2, 456 S.W.3d at 391. Although we give deference to the Commission on issues of the weight of evidence and credibility of witnesses, the Commission may not arbitrarily disregard testimony and is not so insulated that it renders appellate review meaningless. *Durham v. Prime Indus. Recruiters, Inc.*, 2014 Ark. App. 494, at 2, 442 S.W.3d 881, 882–83.

III. *Discussion*

Under Arkansas Code Annotated section 11-9-105(a) (Repl. 2012), the "rights and remedies granted to an employee subject to the provisions of [the Workers' Compensation Act], on account of injury or death, shall be exclusive of all other rights and remedies of the employee, his legal representative, dependents, next of kin, or anyone otherwise entitled to recover damages from the employer." At issue in this case is whether FNA is a dual employer of Humphries and therefore protected from suit by this exclusive-remedy provision.

In order to determine whether FNA enjoys immunity under the exclusive-remedy statute, we must consider the so-called "dual-employment doctrine." This doctrine potentially comes into play in circumstances like those presented in this case, when a temporary staffing agency "lends" an employee to another employer. In *Daniels v. Riley's Health & Fitness Centers*, 310 Ark. 756, 840 S.W.2d 177 (1992), the supreme court held that

10

when a general employer lends an employee to a special employer, the special employer becomes liable for workers' compensation only if three conditions are satisfied: "(a) the employee has made a contract for hire, express or implied, with the special employer; (b) the work being done is essentially that of the special employer; and (c) the special employer has the right to control the details of the work." *Daniels*, 310 Ark. at 759, 840 S.W.2d at 178 (quoting 1C, A. Larson, *The Law of Workmen's Compensation*, § 48.00 (1962)). When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workers' compensation. *Id.* Stated another way, the test established in *Daniels* is a three-part *conjunctive* test. *Gann v. CK Asphalt, LLC*, 2023 Ark. App. 218, 666 S.W.3d 116.

All parties in this case appear to agree that there is no express contract for hire between Humphries and FNA. Thus, in order to satisfy the first prong of the *Daniels* test, we must determine whether there is an implied contract for hire. The existence of an implied contract for hire is a factual question to be determined on the totality of the circumstances surrounding the relationship of *the claimant and the special employer. Randolph v. Staffmark*, 2015 Ark. App. 135, 456 S.W.3d 389.

The Commission's analysis of whether there was an implied contract between Humphries and FNA focused on "which party controls the work being done." *See Est. of Bogar v. Welspun Pipes, Inc.*, 2014 Ark. App. 536, 444 S.W.3d 405. The Commission cites testimony from the hearing before the ALJ that FNA determined working hours, breaks, pay rates, dress code, and who would be line leaders. It notes that FNA maintained the right to assign worker tasks and the right to fire employees. In short, the Commission concluded that

11

because FNA "had total control over all aspects of the work done in their facility, including the quality of the work and how the work was performed," the parties were operating under an implied contract at the time of Humphries's injury, and FNA was thus a dual employer entitled to the protection of the exclusive-remedy doctrine.

The existence of an implied contract is not dependent solely on the nature of one party's control, however. Our supreme court set forth the standard for determining whether an implied agreement exists in *K.C. Properties of N.W. Arkansas, Inc. v. Lowell Investment Partners, LLC*, 373 Ark. 14, 280 S.W.3d 1 (2008):

> In 1 Williston, *Contracts* § 3 (3d ed.1957) contracts implied in fact are treated as true contracts arising from mutual agreements and intents to promise where the agreement and promise have not been expressed in words and it is noted at page 11, "The elements requisite for an informal contract, however, are identical whether they are expressly stated or implied in fact." The difference between an expressed contract containing an actual promise and an implied contract where the contract is implied from the conduct of the parties is merely in the mode of manifesting assent and in the mode of proof. Both express and implied contracts are founded upon *mutual assent of the parties and require a meeting of the minds.* 17 C.J.S. *Contracts* § 3 at pp. 553–554 (1963) (quoting *Crosby v. Hardeman, Inc.*, 414 F.2d 1 (8th Cir. 1969)).

*Id.* at 28–29, 280 S.W.2d at 13 (emphasis added). We have held that a contract implied in fact derives from the "presumed" intention of the parties as indicated by their conduct. *Steed v. Busby*, 268 Ark. 1, 7, 593 S.W.2d 34, 38 (1980) (citing *Caldwell v. Mo. State Life Ins. Co.*, 148 Ark. 474, 230 S.W. 566 (1921)). Stated differently, an implied contract is proved by evidence of circumstances showing that through the general course of dealing between the parties––here, Humphries and FNA––the parties intended to contract. *City of Batesville v. Independence Cnty.*, 2023 Ark. App. 401, 678 S.W.3d 35. Apart from its naked assertion that

12

the parties were operating under an implied contract at the time of Humphries's injury, the Commission undertakes no analysis of *what the parties intended*.

As we examine the parties' intents, Humphries's intent was readily apparent from his testimony. He emphatically stated that he never had the desire or intent to work for FNA. *Compare Randolph*, 2015 Ark. App. 135, at 6, 456 S.W.3d at 393 (holding parties impliedly intended to contract when both employee and special employer "operated on the belief that Randolph would garner full-time employee benefits after he logged sufficient hours").

Evidence of FNA's intent can be gleaned from several sources. Of significance, we note that the contract FNA signed with Labor Solutions contained FNA's agreement that none of Labor Solutions' personnel would be deemed employees of FNA for any purpose relating to the agreement. In addition, while witnesses from FNA testified that FNA generally controlled the work that was done on its floor, none of them testified specifically as to FNA's relationship *with Humphries*. For example, Hickson testified that he did not know who put Humphries on the baler on the day of his injury, who trained Humphries, or what specific job duties he performed; Hickson further acknowledged that he had no interaction with, training of, or control over Humphries, whom FNA concedes was a seasonal employee. Moffett similarly testified that he was unaware of any training that FNA ever provided to Humphries, and he could not name any person at FNA who directed Humphries from one position to another. We find particularly telling Moffett's testimony that because of the contract stating Labor Solutions' personnel were not to be considered FNA employees, FNA

13

would reserve the right to deny that Humphries was its employee in any litigation context other than workers' compensation.

As stated above, the existence of an implied contract between FNA and Humphries depends on the intent of the parties. *See, e.g.*, *Steed*, *supra*. Each case depends on its own particular facts. *Ward v. Com. Constr. Co., Inc.*, 2024 Ark. App. 150, at 8, 686 S.W.3d 36, 42. While we recognize that control over the work is an important factor in determining whether an implied contract for hire exists under *Daniels*'s first prong, the mere exercise of control, without mutual assent and a meeting of the minds between the employee and the special employer, is insufficient to establish the existence of an implied contract. The specific facts of this case fail to demonstrate that *FNA and Humphries intended* to enter into an implied contract. Because the evidence failed to show the existence of an implied contract for hire, FNA cannot satisfy the first prong of the three-part conjunctive test for dual employment established in *Daniels.*

The Commission's decision is therefore not supported by substantial evidence, and we reverse and remand for proceedings consistent with this opinion.

Reversed and remanded.

GLADWIN and WOOD, JJ., agree.

*Tim Cullen*; *Daniels Law Firm, PLLC*, by: *Shawn Daniels*; and *Hatfield Law Firm*, by: *Jason Hatfield*, for appellant.

*Frye Law Firm, P.A.*, by: *William C. Frye*, for appellees.

*Quattlebaum, Grooms & Tull, PLLC*, by: *Vincent Chadick*, for separate appellee FNA Group, LLC.